# EXHIBIT C

## ADDENDUM TO CARL'S JR. RESTAURANT
## FRANCHISE AGREEMENT FOR USE IN CANADA

**THIS ADDENDUM** to the Carl's Jr. Restaurant Franchise Agreement for Use in Canada dated as of Sept. 11, 2014 ("Franchise Agreement") by and between Carl's Jr. Restaurants LLC ("CJR") and 6Points Food Services Ltd. ("Franchisee") is entered into simultaneously with the Franchise Agreement.

### RECITALS

CJR and Franchisee have entered into the Franchise Agreement pursuant to which Franchisee is authorized to operate a Franchised Restaurant at a Franchised Location.

The parties are entering into this Addendum to memorialize certain agreed-upon modifications to the Franchise Agreement.

**NOW THEREFORE**, in consideration of the covenants and agreements set forth below, the parties agree as follows:

1.     **Applicability.** This Addendum shall apply as long as **(a)** 6Points Food Services Ltd. is the entity signing the Franchise Agreement; **(b)** 6Points Food Services Ltd. is at least 80% owned by Westbridge Capital Ltd.; and **(c)** Mike Meekins and Mike Levine continue to own at least 51% of Westbridge Capital Ltd.

2.     **Exclusivity.** In Section 1.B. of the Franchise Agreement, the first sentence is deleted and replaced with the following: "This Agreement does not give Franchisee any exclusive rights to use the Carl's Jr. System or the Proprietary Marks in any geographic area. Any exclusivity granted to Franchisee is provided under the terms stated in the Development Agreement executed between Franchisee and CJR."

3.     **Guarantee.**

A. The "Guarantee and Assumption of Franchisee's Obligations" ("Guarantee") is struck from the Franchise Agreement.

B. In lieu of execution of a Guarantee as required by Section 13.E. of the Franchise Agreement, CJR has agreed to accept, as security for Franchisee's obligations, a letter of credit pursuant to the terms and conditions of the Letter of Credit Agreement signed by the parties. Notwithstanding CJR's agreement to not require execution of a Guarantee (under the conditions detailed in the Letter of Credit Agreement), the provisions in the Franchise Agreement that reference any obligations of guarantors other than the signing of a Guarantee – including but not limited to Sections 16 and 17 of the Franchise Agreement – shall remain in effect, with "guarantor" meaning all members of the Continuity Group, all of Franchisee's officers and directors and 10% Owners.

4.     **Initial Term.** The phrase "upon submission by CJR of written documentation of such expenses" shall be added to the end of the second paragraph of Section 2.A. of the Franchise Agreement.

5.     **Income Taxes.** The words "income taxes" are deleted from the list in the first sentence of the second paragraph of Section 3.J. of the Franchise Agreement.

6.     **Annual Reports**. In Section 4.C. of the Franchise Agreement, "60 days" is deleted and replaced with "120 days".

7.     **Reasonable Qualification**.

A.   At the end of the sentence in Section 2.B.(2)(b) of the Franchise Agreement, "as may be necessary to do so" is deleted and replaced with "as may be reasonably necessary to do so."

B.   In Section 3.I.(1)(a) and (b) of the Franchise Agreement, "best efforts" is deleted and replaced with "commercially reasonable efforts."

C.   In Section 3.I.(1)(b) of the Franchise Agreement, "such other currency as CJR may designate" is deleted and replaced with "such other currency as CJR may reasonably designate."

D. In Section 13.B. of the Franchise Agreement, the first sentence is deleted and replaced with "If Franchisee is an entity, copies of all governing documents reasonably requested and designated by CJR have been furnished to CJR."

E. In Section 13.C. of the Franchise Agreement, "as of the date hereof" is added to the end of the first sentence of the first paragraph.

8.     **Release**.

A.     In Section 2.B.(2)(e) of the Franchise Agreement, the language "in their corporate and individual capacities, including, without limitation," is deleted and replaced with "in their corporate and individual capacities, relating to any fact, event, conduct or omission occurring before the end of the Initial Term, including, without limitation,".

B.     Section 16 of the Franchise Agreement is deleted and replaced with the following:

Franchisee (on behalf of itself and its parents, subsidiaries and affiliates), all individuals who execute this Agreement and all guarantors of Franchisee's obligations under this Agreement (collectively, "Releasors") freely and without any influence forever release and covenant not to sue CJR, its parents, subsidiaries, affiliates, predecessors and successors and their respective past and present officers, directors, shareholders, agents and employees, in their corporate and individual capacities, from any and all claims, demands, liabilities and causes of action of whatever kind or nature, whether known or unknown, vested or contingent, suspected or unsuspected (collectively "claims"), including, without limitation, claims arising under federal, provincial and local laws, rules and ordinances, claims for contribution, indemnity and/or subrogation and claims arising out of, or relating to this Agreement and all other agreements between any Releasor and CJR or its parents, subsidiaries, affiliates, or predecessors, the sale of a franchise to any Releasor, the development and operation of the Franchised Restaurant and the development and operation of all other restaurants operated by any Releasor that are or were franchised by CJR or its parents, subsidiaries, affiliates or predecessors. This release applies only to any claim based on, arising out of, or relating to, in whole or in part, any fact, event, conduct or omission occurring on or before the date of this Agreement which any Releasor now owns or holds or may in the future own or hold. Franchisee (on behalf of

the Releasors) expressly agrees that fair consideration has been given by CJR for this release and fully understands that this is a negotiated, complete and final release of all claims. Franchisee (on behalf of the Releasors) also expressly agrees that, with respect to this release, any and all rights granted under Section 1542 of the California Civil Code are expressly waived, to the extent applicable. That Section reads as follows: "A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release which if known by him must have materially affected his settlement with the debtor."

9.    **Materiality Qualification**.

A. Section 2.B.(2)(f) of the Franchise Agreement is deleted and replaced with the following:

As determined by CJR in its sole discretion, Franchisee has operated the Franchised Restaurant and all of its other franchised Carl's Jr. Restaurants in accordance with the applicable franchise agreements and with the Carl's Jr. System (as set forth in the OPM or otherwise and as revised from time to time by CJR) in all material respects and has operated each of its other restaurants that are franchised by CJR or its affiliates in accordance with the applicable franchise agreement in all material respects.

B. The phrase "in all material respects" is added to the end of Section 29.G. of the Franchise Agreement.

10.    **Notice**. In Section 10.J. of the Franchise Agreement, the language "or other government instrumentality, which may adversely affect" is deleted and replaced with "or other government instrumentality of which it has received notice, which may adversely affect".

11.    **Transfers**.

A. The following clause is added to the end of Section 14 of the Franchise Agreement: "provided that CJR's assignee has the right to license the Proprietary Marks and the Carl's Jr. System to Franchisee."

B. The first paragraph of Section 15.A. of the Franchise Agreement is deleted and replaced with the following:

Franchisee understands and acknowledges that the rights and duties set forth in this Agreement are personal to Franchisee and that CJR has entered into this Agreement in reliance on Franchisee's business skill, financial capacity, personal character, experience and demonstrated or purported ability in developing and operating high quality foodservice operations. Accordingly, neither Franchisee nor any immediate or remote successor to any part of Franchisee's interest in this Agreement, nor any individual, partnership, corporation or other legal entity which directly or indirectly has an interest in Franchisee ("Franchisee Owner") shall sell, assign, transfer, convey, give away, pledge, mortgage, or otherwise encumber any interest in Franchisee, this Agreement, the Franchise, the Franchised Restaurant, the assets of the Franchised Restaurant, the Franchised Location or any other assets pertaining to Franchisee's operations under this Agreement (collectively "Transfer") without

the prior written consent of CJR. Any sale, assignment, transfer, conveyance, giving away, pledge, mortgage or other encumbrance of any interest in a Franchisee Owner also shall be considered a Transfer that requires CJR's prior written consent.

**C.** The first sentence of Section 15.B.(2) of the Franchise Agreement is deleted and replaced with "The sales price shall not be so high, in CJR's reasonable judgment, as to jeopardize the ability of the transferee to develop, maintain, operate and promote the Franchised Restaurant and meet financial obligations to CJR, third party suppliers and creditors. CJR and Franchisee agree that a purchase price of up to 9 times EBITDA shall presumptively meet the qualification stated in the previous sentence."

**D.** In the second sentence in Section 15.C.(2) of the Franchise Agreement, "In either event," is deleted and replaced with "In either event, if requested by CJR in its sole discretion,".

**E.** In the third sentence of Section 15.I. of the Franchise Agreement, the language "and an opinion of one other counsel selected by CJR (both of which shall be addressed to CJR and in a form acceptable to CJR)" is deleted and replaced with "(in a form acceptable to CJR)".

**F.** In the first sentence of Section 15.J. of the Franchise Agreement, the parenthetical "(other than a Transfer for convenience of ownership pursuant to Section 15.D. or a sale of ownership interests in Franchisee to a spouse, parent, child or sibling)" is deleted and replaced with "(other than a Transfer for convenience of ownership pursuant to Section 15.D. or a sale of ownership interests in Franchisee to a spouse, parent, child or sibling, or as part of an internal corporate reorganization)".

**G.** At the end of the third paragraph of Section 15.J. of the Franchise Agreement, the following is added to the end of the last sentence ", which shall not be unreasonably withheld."

12.     **Covenants**.

**A.**     Section 17.B.(5) of the Franchise Agreement is deleted and replaced with "**(5)** Franchisee has no right to disclose any part of the Carl's Jr. System to anyone who is not an employee of Franchisee (provided that Franchisee may disclose such information to its professional advisors, lenders and investors, as necessary);".

**B.**     The following clause is added to the end of Section 17.C.(2)(b) of the Franchise Agreement: ", provided that a general public solicitation shall not be a breach of this covenant;".

13.     **Indemnification.**

**A.** In Section 22.A. of the Franchise Agreement, reference to "Franchisee and all guarantors of Franchisee's obligations under this Agreement" in the first sentence is deleted and replaced with "Franchisee".

**B.** In the last sentence of the first paragraph of Section 22.A. of the Franchise Agreement, the language "filed or instituted against Franchisee and," is deleted and replaced with "filed or instituted against Franchisee of which notice has been received and".

14.    **Entire Agreement**.

    **A.** The clause "except as otherwise provided in this Agreement" is struck from the first sentence of Section 25 of the Franchise Agreement.

    **B.** In the second sentence of Section 25 of the Franchise Agreement, the language "This Agreement, the OPM, the documents referred to herein," is deleted and replaced with "This Agreement, the OPM, the Letter of Credit Agreement, the Franchise Agreement Addendum, the documents referred to herein,".

15.    **Operating Principal**. So long as Kent Graber acts as the Operating Principal, and the ownership interests of Franchisee are as set forth in Appendix B of the Franchise Agreement, CJR agrees to waive **(A)** the requirement that the Operating Principal have at least 5% equity ownership interest in Franchisee and **(B)** the requirement that the Operating Principal be a member of the Continuity Group.

16.    **Continuity Group**. So long as the ownership interests of Franchisee are as set forth in Appendix C of the Development Agreement executed between Franchisee and CJR, CJR agrees that: **(a)** the requirement in Section 13.D. of the Franchise Agreement that the Continuity Group must own 51% of the ownership interest of Franchisee can be satisfied by indirect ownership interests; and **(b)** Mike Meekins and Mike Levine may act as the Continuity Group.

17.    **Capitalized Terms**. All capitalized terms that are not defined in this Addendum shall have the meaning given them in the Franchise Agreement.

18.    **Limited Amendment**. Except as modified by this Addendum, the Franchise Agreement remains unmodified and in full force and effect.


**[SIGNATURES ON FOLLOWING PAGE]**

**IN WITNESS WHEREOF,** the parties have duly executed, sealed and delivered this Addendum simultaneously with the Franchise Agreement.

ATTEST:

By: _Wendy Wilson_

Print Name: _Wendy Wilson_

Title: _Contract Coordinator_

ATTEST:

By: _____

Print Name: _____

Title: _Notary Public_

CJR:
**CARL'S JR. RESTAURANTS LLC**

By: _____

Print Name: Romondous Stover

Title: _Vice President, Legal_

Date: _November 12, 2014_

**FRANCHISER:**
**6POINTS FOOD SERVICES LTD.**

By: _____

Print Name: Michael Levine

Title: _President_

Date: _October 27, 2014_

**CARL'S JR. RESTAURANT FRANCHISE AGREEMENT
FOR USE IN CANADA**

**6POINTS FOOD SERVICES LTD.**

**RESTAURANT NO. 1102336/8538**

**WATERLOO**

**75 KING STREET, CROSS STREET: WILLIS WAY**

**WATERLOO, ONTARIO, CANADA**

## TABLE OF CONTENTS

| SECTION | PAGE |
|---|---|
| 1. GRANT OF FRANCHISE | 2 |
| 2. TERM | 2 |
| 3. FEES | 4 |
| 4. RECORDKEEPING AND REPORTS | 8 |
| 5. ADVERTISING AND PROMOTION | 9 |
| 6. OPERATION PROCEDURES MANUAL | 12 |
| 7. MODIFICATIONS OF THE SYSTEM | 12 |
| 8. TRAINING | 13 |
| 9. ADDITIONAL SERVICES BY CJR | 14 |
| 10. PERFORMANCE STANDARDS AND UNIFORMITY OF OPERATION | 16 |
| 11. PROPRIETARY MARKS | 21 |
| 12. INSURANCE | 22 |
| 13. ORGANIZATION OF FRANCHISEE | 23 |
| 14. TRANSFERS BY CJR | 25 |
| 15. TRANSFERS BY FRANCHISEE | 25 |
| 16. GENERAL RELEASE | 29 |
| 17. COVENANTS | 29 |
| 18. TERMINATION | 32 |
| 19. OBLIGATIONS ON TERMINATION OR EXPIRATION | 34 |
| 20. OPTION TO PURCHASE | 35 |
| 21. RELATIONSHIP OF THE PARTIES | 37 |
| 22. INDEMNIFICATION | 37 |
| 23. CONSENTS, APPROVALS AND WAIVERS | 38 |
| 24. NOTICES | 38 |
| 25. ENTIRE AGREEMENT | 39 |
| 26. SEVERABILITY AND CONSTRUCTION | 39 |
| 27. GOVERNING LAW, FORUM AND LIMITATIONS | 40 |
| 28. MISCELLANEOUS | 41 |
| 29. REPRESENTATIONS | 42 |
| 30. ETHICAL STANDARDS | 43 |
| GUARANTEE AND ASSUMPTION OF FRANCHISEE'S OBLIGATIONS | 1 |
| APPENDIX A FRANCHISE INFORMATION | 1 |
| APPENDIX B | 1 |
| OWNERSHIP INTERESTS | 1 |

GUARANTEE AND ASSUMPTION OF FRANCHISEE'S OBLIGATIONS
APPENDIX A - FRANCHISE INFORMATION
APPENDIX B – OWNERSHIP INTERESTS
APPENDIX C - LIST OF PROPRIETARY MARKS

## CARL'S JR. RESTAURANT FRANCHISE AGREEMENT
## FOR USE IN CANADA

**THIS AGREEMENT** is made as of September 11, 2014 by and between Carl's Jr. Restaurants LLC ("CJR"), a Delaware limited liability company, with its principal offices located at 6307 Carpinteria Avenue, Suite A, Carpinteria, California 93013 U.S.A., and 6Points Food Services Ltd. ("Franchisee"), a limited liability company incorporated and organized under the laws of Ontario, with its principal offices located at Unit A-28, 134 Primrose Drive, Saskatoon, Saskatchewan, Canada S7K 5S6.

### RECITALS:

As a result of the expenditure of time, skill, effort and money, CJR and its predecessors have developed, and CJR owns, a unique and distinctive system ("Carl's Jr. System") relating to the development, establishment and operation of fast service restaurants ("Carl's Jr. Restaurants").

The distinguishing characteristics of the Carl's Jr. System include, without limitation, uniform and distinctive exterior and interior design, layout and trade dress, including specially designed decor and furnishings; an efficient kitchen and equipment layout featuring an automatic charbroiling cooking process; special recipes and menu items; procedures and techniques for food and beverage storage, preparation, service and sanitation; technical assistance and training through course instruction and manuals; and advertising and promotional programs. The Carl's Jr. System and its components may be changed, improved, and further developed by CJR from time to time.

CJR identifies the Carl's Jr. System by the name "Carl's Jr." and other names, marks, logos, insignias, slogans, emblems, symbols and designs (collectively, "Proprietary Marks") which CJR owns and has designated or may in the future designate for use with the Carl's Jr. System. The Proprietary Marks used to identify the Carl's Jr. System, including the principal Proprietary Marks, may be modified by CJR and/or its affiliates from time to time.

CJR continues to develop, use and control the use of these Proprietary Marks in order to identify for the public the source of services and products marketed under the Proprietary Marks and the Carl's Jr. System and to represent the Carl's Jr. System's high standards of quality, appearance and service.

Franchisee desires to obtain from CJR a license to use the Carl's Jr. System and to continuously operate one Carl's Jr. Restaurant ("Franchised Restaurant") at the location specified in attached Appendix A ("Franchised Location").

Franchisee understands and acknowledges the importance of CJR's high and uniform standards of quality, operations and service and the necessity of developing and operating the Franchised Restaurant in strict conformity with this Agreement and the Operation Procedures Manual ("OPM").

CJR is willing to grant Franchisee a license to operate the Franchised Restaurant at the Franchised Location, subject to the terms and conditions of this Agreement and in strict compliance with the standards and specifications established by CJR.

**NOW THEREFORE**, in consideration of CJR's grant to Franchisee of the right to operate a Franchised Restaurant at the Franchised Location during the term of this Agreement, as well as the mutual covenants, agreements and obligations set forth below, the parties agree as follows:

## 1. GRANT OF FRANCHISE

### A. Grant

Subject to the provisions of this Agreement, CJR hereby grants to Franchisee the nonexclusive right ("Franchise") to continuously operate the Franchised Restaurant at the Franchised Location and to use the Proprietary Marks in the operation of the Franchised Restaurant. Franchisee may not operate the Franchised Restaurant at any site other than the Franchised Location and may not relocate the Franchised Restaurant without CJR's prior written consent, which may be withheld by CJR in its sole discretion. If CJR consents to a relocation of the Franchised Restaurant, it shall have the right to charge Franchisee for all reasonable expenses actually incurred in connection with the consideration of the relocation request.

Franchisee agrees that it will at all times faithfully, honestly and diligently perform its obligations under this Agreement, that it will continuously exert its best efforts to promote and enhance the business of the Franchised Restaurant and that it will not engage in any other business or activity that may conflict with its obligations under this Agreement, except the operation of other Carl's Jr. Restaurants or other restaurants operated by Franchisee that are franchised by CJR or its affiliates.

### B. No Exclusivity

This Agreement does not give Franchisee any exclusive rights to use the Carl's Jr. System or the Proprietary Marks in any geographic area. Nothing in this Agreement prohibits CJR or its affiliates from, among other things: (1) operating or licensing others to operate at any location, during or after the term of this Agreement, any type of restaurant other than Carl's Jr. Restaurants; (2) operating or licensing others to operate, during the term of this Agreement, Carl's Jr. Restaurants at any location other than the Franchised Location; (3) operating or licensing others to operate, after this Agreement terminates or expires, Carl's Jr. Restaurants at any location, including the Franchised Location; and (4) merchandising and distributing goods and services identified by the Proprietary Marks at any location through any other method or channel of distribution. CJR reserves to itself all rights to use and license the Carl's Jr. System and the Proprietary Marks other than those expressly granted under this Agreement.

### C. Forms of Agreement

Franchisee acknowledges that, over time, CJR and its predecessors have entered, and CJR will continue to enter, into agreements with other franchisees that may contain provisions, conditions and obligations that differ from those contained in this Agreement. The existence of different forms of agreement and the fact that CJR and other franchisees may have different rights and obligations does not affect the duties of the parties to this Agreement to comply with the terms of this Agreement.

## 2. TERM

### A. Initial Term

The Initial Term of this Agreement and the Franchise granted by this Agreement shall begin on the date of this Agreement and terminate at midnight on the day preceding the 20th anniversary of the date the Franchised Restaurant first opened for business, unless this Agreement is terminated at an earlier date pursuant to Section 18. CJR shall complete and forward to Franchisee a notice to memorialize the date the Franchised Restaurant first opened for business.

Notwithstanding the foregoing, if, during the term of this Agreement, Franchisee, through no act or failure to act on its part (except the failure to extend the lease for the Franchised Location through the Initial Term of this Agreement) loses the right to possession of the Franchised Location, the Initial Term shall expire as of the date of the loss of the right to possession. However, if the right to possession is lost through no act or failure to act on Franchisee's part, Franchisee may relocate the Franchised Restaurant (without paying any additional initial franchise fee or transfer fee) at its expense, and the Initial Term shall not expire if: **(1)** CJR accepts the new location; **(2)** Franchisee constructs and equips a Franchised Restaurant at the new location in accordance with the then-current Carl's Jr. System standards and specifications; **(3)** a Franchised Restaurant at the new location is open to the public for business within 6 months after the loss of possession of the Franchised Location; and **(4)** Franchisee reimburses CJR for all reasonable expenses actually incurred by CJR in connection with the consideration and acceptance of the relocation request.

**B.   Renewal Term**

**(1)**    At the expiration of the Initial Term, Franchisee shall have an option to remain a franchisee at the Franchised Location for a Renewal Term of 10 years or, at Franchisee's option, 5 years. Franchisee must give CJR written notice of whether or not it intends to exercise its renewal option and the length of the proposed Renewal Term not less than 12 months, nor more than 24 months, before the expiration of the Initial Term. Notwithstanding the foregoing, if Franchisee subleases the Franchised Location from CJR, Franchisee must give CJR the notice described in the preceding sentence not less than 6 months, nor more than 12 months, before notice of renewal is required to be provided to the landlord under the master lease. Failure by Franchisee to timely provide CJR the required notice constitutes a waiver by Franchisee of its option to remain a franchisee beyond the expiration of the Initial Term.

**(2)**    If Franchisee desires to continue as a franchisee for the Renewal Term, Franchisee must comply with all of the following conditions prior to and at the end of the Initial Term:

**(a)**    Franchisee shall not be in default under this Agreement or any other agreements between Franchisee and CJR or its affiliates; Franchisee shall not be in default beyond the applicable cure period under any real estate lease, equipment lease or financing instrument relating to the Franchised Restaurant; Franchisee shall not be in default beyond the applicable cure period with any vendor or supplier to the Franchised Restaurant; and, for the 12 months before the date of Franchisee's notice and the 12 months before the expiration of the Initial Term, Franchisee shall not have been in default beyond the applicable cure period under this Agreement or any other agreements between Franchisee and CJR or its affiliates.

**(b)**    Franchisee shall make the capital expenditures required to renovate and modernize the Franchised Restaurant to conform to the interior and exterior designs, decor, color schemes, furnishings and equipment and presentation of the Proprietary Marks consistent with the image of the Carl's Jr. System for new Carl's Jr. Restaurants at the time Franchisee provides CJR the renewal notice, including such structural changes, remodeling, redecoration and modifications to existing improvements as may be necessary to do so.

**(c)**    Franchisee and its employees at the Franchised Restaurant shall be in compliance with CJR's then-current training requirements.

**(d)**    Franchisee shall have the right to remain in possession of the Franchised Location, or other premises acceptable to CJR, for the Renewal Term and all monetary obligations owed to Franchisee's landlord, if any, must be current.

**(e)**    Franchisee, all individuals who executed this Agreement and all guarantors of Franchisee's obligations shall have executed a general release and a covenant not to sue, in a form satisfactory to CJR, of any and all claims against CJR and its affiliates and their respective past and present officers, directors, shareholders, agents and employees, in their corporate and individual capacities, including, without limitation, claims arising under federal, provincial, and local laws, rules, regulations, and

by-laws, and claims arising out of, or relating to, this Agreement, any other agreements between Franchisee and CJR or its affiliates and Franchisee's operation of the Franchised Restaurant, other Carl's Jr. Restaurants operated by Franchisee and all other restaurants operated by Franchisee that are franchised by CJR or its affiliates.

(f)     As determined by CJR in its sole discretion, Franchisee has operated the Franchised Restaurant and all of its other franchised Carl's Jr. Restaurants in accordance with the applicable franchise agreements and with the Carl's Jr. System (as set forth in the OPM or otherwise and as revised from time to time by CJR) and has operated each of its other restaurants that are franchised by CJR or its affiliates in accordance with the applicable franchise agreement.

(3)     Within 4 months after CJR's receipt of Franchisee's written notice of its desire to renew, CJR shall advise Franchisee whether or not Franchisee is entitled to remain a franchisee for the Renewal Term. If CJR intends to permit Franchisee to remain a franchisee for the Renewal Term, CJR's notice will contain preliminary information regarding actions Franchisee must take to satisfy Sections 2.B.(2)(b) and (c). If CJR does not intend to permit Franchisee to remain a franchisee for the Renewal Term, CJR's notice shall specify the reasons for non-renewal. If CJR chooses not to permit Franchisee to remain a franchisee for the Renewal Term, CJR shall have the right to unilaterally extend the Initial Term of this Agreement as necessary to comply with any applicable laws.

(4)     If Franchisee will remain a franchisee for the Renewal Term, CJR shall forward to Franchisee a new franchise agreement for the Renewal Term for Franchisee's signature at least 4 months prior to the expiration of the Initial Term. The form of renewal franchise agreement shall be the form then in general use by CJR for Carl's Jr. Restaurants operating in Canada (or, if CJR is not then granting franchises for Carl's Jr. Restaurants, that form of agreement as specified by CJR) and likely will differ from this Agreement, including, but not limited to, provisions relating to the royalty fee and advertising obligations.

(5)     Franchisee shall pay CJR a renewal fee in the amount of U.S. $5,000 for a Renewal Term of 5 years or less or U.S. $10,000 for a Renewal Term greater than 5 years, but no more than 10 years.

(6)     Franchisee shall execute the renewal franchise agreement for the Renewal Term and return the signed agreement to CJR, along with the renewal fee, at least one month prior to the expiration of the Initial Term. Failure by Franchisee to sign the renewal franchise agreement and return it to CJR (along with the renewal fee) within this time shall be deemed an election by Franchisee not to renew the Franchise and shall result in termination of this Agreement and the Franchise granted by this Agreement at the expiration of the Initial Term. Provided Franchisee has timely complied with all of the conditions set forth in this Section 2.B., CJR shall execute the renewal franchise agreement and promptly return a fully-executed copy to Franchisee.

3.     **FEES**

A.     **Initial Franchise Fee**

No later than the date that Franchisee executes this Agreement, but in any event prior to the commencement of construction of the Franchised Restaurant, Franchisee shall pay CJR an Initial Franchise Fee in the amount specified in Appendix A. Franchisee acknowledges and agrees that the Initial Franchise Fee was paid in consideration of CJR's initially granting this Franchise, it was fully earned at the time paid and it is not refundable for any reason whatsoever.

B.     **Royalty Fee**

In addition to all other amounts to be paid by Franchisee to CJR, Franchisee shall pay CJR a nonrefundable and continuing royalty fee in an amount equal to 5% of the Gross Sales of the Franchised Restaurant, for the right to use the Carl's Jr. System and the Proprietary Marks at the Franchised Location. Except as otherwise provided in Section 3.J., if any taxes, fees or assessments are imposed on CJR in Canada

by reason of its acting as franchisor or licensing the Proprietary Marks under this Agreement, Franchisee shall reimburse CJR the amount of those taxes, fees or assessments within 30 days after receipt of an invoice from CJR.

Gross Sales shall include all revenue from the sale of all services and products and all other income of every kind and nature (excluding revenue from the sale of stored value gift cards or gift certificates but including revenue when gift certificates are redeemed or stored value gift cards are debited) related to the Franchised Restaurant, whether for cash or credit and regardless of collection in the case of credit; provided, however, that Gross Sales shall not include any sales taxes or other taxes actually collected from customers by Franchisee, but only to the extent paid to the appropriate taxing authority.

### C.    Advertising Fees

Franchisee also shall spend and/or contribute for advertising an amount specified by CJR up to 7% of Gross Sales, as set forth in Appendix A, and further explained in Section 5.

### D.    Remittance Reports

Within 5 calendar days after the end of each fiscal period (as defined by CJR from time to time), Franchisee shall submit to CJR, and, as specified by CJR, its affiliate or their respective designees, in writing (or by electronic mail, polling by computer or such other form or method as CJR may designate) the amount of Gross Sales from the Franchised Restaurant during the preceding fiscal period and such other data or information as CJR may require.

### E.    Payment of Fees

Within 10 calendar days after the end of each fiscal period, Franchisee shall pay (by check or by such other form or method as CJR may designate) CJR the royalty fee, and pay CJR, its affiliate or their respective designees the advertising fees required by Sections 5.B.-E. applicable to the Gross Sales for the fiscal period.

In the alternative, upon receipt of written notice from CJR, Franchisee shall pay CJR the royalty fee applicable to the Gross Sales and shall pay CJR, its affiliate or their respective designees other amounts under this Agreement, including advertising fees and interest charges, by electronic funds transfer. In connection with payment of these fees by electronic funds transfer, CJR, its affiliate or their respective designators may designate a day for payment ("Due Date") different than that provided in the preceding paragraph. On each Due Date, CJR, its affiliate or their respective designees will transfer from the Franchised Restaurant's bank operating account ("Account") the amount reported to CJR in Franchisee's remittance report or determined by CJR by the records contained in the cash registers/computer terminals of the Franchised Restaurant. If Franchisee has not reported Gross Sales to CJR for any fiscal period, CJR, its affiliate or their respective designees will transfer from the Account an amount calculated in accordance with its estimate of the Gross Sales during the fiscal period. If, at any time, CJR determines that Franchisee has underreported the Gross Sales of the Franchised Restaurant, or underpaid the royalty fee or other amounts due to CJR under this Agreement, or any other agreement, CJR, its affiliate or their respective designees shall initiate an immediate transfer from the Account in the appropriate amount in accordance with the foregoing procedure, including interest as provided in this Agreement. Any overpayment will be credited to the Account effective as of the first reporting date after CJR and Franchisee determine that such credit is due.

In connection with Franchisee's payment by electronic funds transfer, Franchisee shall: (1) comply with procedures specified by CJR in the OPM or otherwise in writing; (2) perform those acts and sign and deliver those documents as may be necessary to accomplish payment by electronic funds transfer as described in this Section 3.E.; (3) give CJR, its affiliate or their respective designees an authorization in the form designated by CJR to initiate debit entries and/or credit correction entries to the Account for payments of the royalty fee and other amounts payable under this Agreement, including any interest charges; and

(4) make sufficient funds available in the Account for withdrawal by electronic funds transfer no later than the Due Date for payment thereof.

Failure by Franchisee to have sufficient funds in the Account shall constitute a default of this Agreement pursuant to Section 18.B.(2). Franchisee shall not be entitled to set off, deduct or otherwise withhold any royalty fees, advertising contributions, interest charges or any other monies payable by Franchisee under this Agreement on grounds of any alleged non-performance by CJR of any of its obligations or for any other reason.

### F.    Interest

If any payments by Franchisee due to CJR are not received by CJR by the date due, Franchisee, in addition to paying the amount owed, shall pay CJR interest on the amount owed from the date due until paid at the maximum rate permitted for indebtedness of this nature in the province in which the Franchised Restaurant is located, not to exceed 18% per annum. Payment of interest by Franchisee on past due obligations is in addition to all other remedies and rights available to CJR pursuant to this Agreement or under applicable law.

### G.    Partial Payments

No payment by Franchisee or acceptance by CJR of any monies under this Agreement for a lesser amount than due shall be treated as anything other than a partial payment on account. Franchisee's payment of a lesser amount than that due with an endorsement, statement or accompanying letter to the effect that payment of the lesser amount constitutes full payment shall be given no effect and CJR may accept the partial payment without prejudice to any rights or remedies it may have against Franchisee. Acceptance of payments by CJR other than as set forth in this Agreement shall not constitute a waiver of CJR's right to demand payment in accordance with the requirements of this Agreement or a waiver by CJR of any other remedies or rights available to it pursuant to this Agreement or under applicable law. Notwithstanding any designation by Franchisee, CJR shall have sole discretion to apply any payments by Franchisee to any of its past due indebtedness for royalty fees, advertising contributions, purchases from CJR or its affiliates, interest or any other indebtedness. CJR has the right to accept payment from any other entity as payment by Franchisee. Acceptance of that payment by CJR will not result in that other entity being substituted for Franchisee.

### H.    Collection Costs and Expenses

Franchisee agrees to pay to CJR on demand any and all costs and expenses incurred by CJR in enforcing the terms of this Agreement, including, without limitation, collecting any monies owed by Franchisee to CJR. These costs and expenses include, but are not limited to, costs and commissions due a collection agency, reasonable attorneys' fees (including attorneys' fees for in-house counsel employed by CJR or its affiliates and any attorneys' fees incurred by CJR in bankruptcy proceedings), costs incurred in creating or replicating reports demonstrating Gross Sales of the Franchised Restaurant, court costs, expert witness fees, discovery costs and reasonable attorneys' fees and costs on appeal, together with interest charges on all of the foregoing.

### I.    Payment in United States Dollars

Franchisee shall, unless otherwise specifically agreed by CJR or except as otherwise provided in this Section 3.I., pay, or cause to be paid, to CJR or its affiliates all amounts payable to CJR or its affiliates under this Agreement or any related agreement in United States Dollars.

(1)    Franchisee shall, at Franchisee's expense, secure all exchange clearances, currency control authorizations and other necessary governmental releases, if any, to permit Franchisee or Franchisee affiliates to remit payment under this Agreement or any related agreement in United States Dollars to CJR or its affiliates.

(a)    If the Canadian government restricts the purchase by Franchisee of United States Dollars or the transfer of United States Dollars by Franchisee or its affiliates to CJR or its affiliates, Franchisee shall immediately notify CJR of such restriction and use Franchisee's best efforts to obtain any approvals or waivers that may be necessary to effect payment in United States Dollars.

(b)    If despite Franchisee's best efforts, Franchisee is unable to obtain any such approval or waiver with respect to any payment, then until such payment can again be sent to CJR or its affiliates in United States Dollars, Franchisee shall cause such payment to be remitted in such other currency as CJR may designate to such bank account or other location as CJR may designate.

(c)    If payment cannot be made in the alternative manner designated by CJR, CJR may either require Franchisee to deposit the payment in a bank account in the name of CJR at a bank that CJR designates in Canada or consider Franchisee to be in default of this Agreement.

(2)    For purposes of calculating any payments which require conversion from any non-United States currency to United States Dollars, the non-United States currency shall be converted to United States Dollars at the New York selling rate for United States Dollars that *The Wall Street Journal* may quote online - current address http://online.wsj.com/mdc/public/page/2_3021-forex.html - (or such other rate as CJR may from time to time specify): (a) for the date on which the payment is actually made if the payment is received by CJR by the date due; or (b) for the date on which the payment is first due or for the date on which the payment is actually made, whichever CJR determines is more favorable to CJR if the payment is not received by the date due.  Franchisee shall bear the expense of any foreign exchange levies, fees or expenses imposed on the purchase of United States Dollars or any other currency under or in connection with this Agreement.

(3)    Franchisee may arrange for payments under or in connection with this Agreement to be made from within or outside Canada, so long as Franchisee gives CJR reasonable notice of such arrangements for payment and such arrangements comply with all applicable laws.

J.    Taxes

Except as otherwise provided in this Section, Franchisee may deduct any withholding taxes that are imposed by the Canadian Revenue Agency or any provincial or local tax authority on or against any amounts owed to CJR or its affiliates under this Agreement.  Franchisee shall submit to CJR with each payment such documentation required by CJR to demonstrate Franchisee's compliance with this Section in connection with that payment.  If Franchisee fails to submit a tax receipt or other documentary evidence with any payment, Franchisee must submit the payment in its entirety, without deduction, computed as though no withholding applies (i.e., gross-up of the payment), whether or not Franchisee is required to withhold.  Franchisee shall indemnify CJR and its affiliates for any withholding taxes where proper evidence of remittance of the withholding tax to the tax authorities is not provided.  The payments required by Sections 5.B. and 5.C. are net of any GST, withholding, income, VAT or similar tax.

All other taxes and duties imposed now or in the future under the laws of, or by any taxing authority in, Canada on payments by Franchisee to CJR or its affiliates, or otherwise incurred under or in connection with this Agreement, including but not limited to GST, income taxes, stamp taxes, value-added taxes, consumption taxes, use taxes, user fees and sales taxes, shall be the sole responsibility of Franchisee, and Franchisee shall timely pay such taxes to the appropriate taxing authorities and provide CJR or such affiliate with official receipts or other evidence of payment from such taxing authorities within 10 days of the end of each fiscal period during which any such payment is made.  Franchisee shall not be entitled to any reimbursement for any payment made pursuant to this paragraph.  If Franchisee fails to pay such taxes, CJR may either cause all amounts payable to CJR or such affiliate under this Agreement to be grossed up to ensure that CJR or its affiliate receives after tax an amount equal to the amount CJR or such affiliate would have received had Franchisee paid such taxes as required, or pay such taxes itself and cause Franchisee to reimburse CJR or such affiliate immediately for any such payment.  In either case, Franchisee shall

indemnify CJR and its affiliates for the full amount of such taxes and for any loss or liability (including penalties, interest and expenses) arising from Franchisee's failure to pay such taxes.

**4.    RECORDKEEPING AND REPORTS**

**A.    Recordkeeping**

Franchisee agrees to use computerized cash and data capture and retrieval systems that satisfy the requirements of Section I0.D. and meet CJR's specifications and to record sales of the Franchised Restaurant electronically or on tape for all sales at or from the Franchised Location. Franchisee shall keep and maintain, in accordance with any procedures set forth in the OPM, complete and accurate books and records pertaining to the Franchised Restaurant sufficient to fully report to CJR. Franchisee's books and records shall be kept and maintained using generally accepted accounting principles ("GAAP"), if Franchisee uses GAAP in any of its other operations, or using other recognized accounting principles applied on a consistent basis which accurately and completely reflect the financial condition of Franchisee. Franchisee will preserve all of its books, records and provincial and federal tax returns for at least 5 years after the later of preparation or filing (or such longer period as may be required by any governmental entity) and make them available and provide duplicate copies to CJR within 5 days after CJR's written request.

**B.    Periodic Reports**

Franchisee shall, at Franchisee's expense, submit to CJR, in the form prescribed by CJR, a quarterly profit and loss statement and balance sheet (both of which may be unaudited) within 30 days after the end of each fiscal quarter (as defined by CJR from time to time) during each fiscal year (as defined by CJR from time to time). CJR shall have the right, to be exercised in its sole discretion, to require that Franchisee provide CJR profit and loss statements and balance sheets at other times requested by CJR. Each statement and balance sheet shall be signed by Franchisee or by Franchisee's treasurer or chief financial officer attesting that it is true, correct and complete and uses accounting principles applied on a consistent basis which accurately and completely reflect the financial condition of Franchisee.

**C.    Annual Reports**

At CJR's request, Franchisee shall, at its expense, provide to CJR either a reviewed or audited profit and loss statement and balance sheet for the Franchised Restaurant within 60 days after the end of each fiscal year to be signed by Franchisee or by Franchisee's treasurer or chief financial officer attesting that the financial statements present fairly the financial position of Franchisee and the results of operations of the Franchised Restaurant during the period covered. CJR shall have the right, in its reasonable discretion, to require that Franchisee, at Franchisee's expense, submit audited financial statements prepared by a chartered accounting firm acceptable to CJR for any fiscal year or any period or periods of a fiscal year.

**D.    Other Reports**

Franchisee shall submit to CJR, for review or auditing, such other forms, reports, records, information and data as CJR may reasonably designate, in the form and at the times and places reasonably required by CJR, upon request and as specified from time to time in the OPM or otherwise in writing.

**E.    Public Filings**

If Franchisee is or becomes a publicly-held entity in accordance with other provisions of this Agreement, Franchisee shall send to CJR copies of all reports (including responses to comment letters) or schedules Franchisee may file with any governmental agency (certified by Franchisee's chief executive officer to be true, correct, complete and accurate) and copies of any press releases it may issue, within 3 days of the filing of those reports or schedules or the issuance of those releases.

F.    **Audit Rights**

CJR or its designee shall have the right at all reasonable times, both during and after the term of this Agreement, to inspect, copy and audit Franchisee's books, records, and federal, provincial and local tax returns, and such other forms, reports, information and data as CJR reasonably may designate, applicable to the operation of the Franchised Restaurant. If an inspection or audit discloses an understatement of Gross Sales, Franchisee shall pay CJR, within 10 days after receipt of the inspection or audit report, the deficiency in the royalty fees and shall pay CJR, its affiliate or their respective designees, within 10 days after receipt of the inspection or audit report, advertising contributions plus interest (at the rate and on the terms provided in Section 3.F.) from the date originally due until the date of payment. If an inspection or audit is made necessary by Franchisee's failure to furnish reports or supporting records as required under this Agreement, or to furnish such reports, records or information on a timely basis, or if an understatement of Gross Sales for the period of any audit is determined by any audit or inspection to be greater than 2%, Franchisee also shall reimburse CJR for the reasonable cost of the audit or inspection including, without limitation, the charges of attorneys and independent accountants, and the travel expenses, room, board and compensation of CJR's employees or designees involved in the audit or inspection. The foregoing remedies shall be in addition to all other remedies and rights available to CJR under this Agreement or applicable law.

If Franchisee fails to provide CJR on a timely basis with the records, reports and other information required by this Agreement or, upon request of CJR, with copies of same, CJR or its designee shall have access at all reasonable times (and as often as necessary) to Franchisee's books and records for the purpose, among other things, of preparing the required records, reports and other information. Franchisee promptly shall reimburse CJR or its designee for all costs and expenses associated with CJR obtaining such records, reports or other information.

5.    **ADVERTISING AND PROMOTION**

A.    **Contributions/Expenditures by Franchisee**

During the term of this Agreement, Franchisee shall have a fiscal period advertising and promotion obligation ("APO") in the amount set forth in Appendix A. Following written notice to Franchisee, CJR may modify the amount and allocation of the APO subject to the provisions of Section 3.C. Franchisee shall pay, at the same time and in the same manner as the royalty fee: (1) that portion of the APO as CJR may direct to the Production Fund in accordance with Section 5.B.; and (2) that portion of the APO as CJR may direct to a Marketing Fund in accordance with Section 5.C. The remainder of the APO, if any, will be spent for Local Store Marketing ("LSM") in accordance with Section 5.E.

B.    **Production Fund**

CJR will maintain and administer a fund for the creation and development of advertising, marketing and public relations, research and related programs, activities and materials that CJR, in its sole discretion, deems appropriate for a geographic area prescribed by CJR ("Production Fund"). Franchisee shall contribute to the Production Fund that amount as specified by CJR from time to time.

CJR, its affiliate or their respective designees shall direct all advertising, marketing, and public relations programs and activities financed by the Production Fund, with sole discretion over the creative concepts, materials and endorsements used in those programs and activities, and the geographic, market and media placement and allocation of advertising and marketing materials. Franchisee agrees that the Production Fund may be used among other things to pay the costs of preparing and producing such associated materials and programs as CJR, its affiliate or their respective designees may determine, including video, audio and written advertising materials; employing advertising agencies; sponsorship of sporting, charitable or similar events; administering regional and multi-regional advertising programs, including, without limitation, purchasing direct mail and other media advertising and employing advertising agencies to assist with these efforts; hiring employees (whether full-time or part-time); and supporting public relations, market research and other advertising, promotional and marketing activities. Franchisee agrees to participate

in all advertising, marketing, promotions, research and public relations programs instituted by the Production Fund. From time to time, CJR, its affiliate or their respective designees may furnish Franchisee with marketing, advertising and promotional materials at the cost of producing them, plus any related shipping, handling and storage charges.

### C. Marketing Funds

CJR may, from time to time, upon notice to Franchisee: (1) establish, maintain, operate or discontinue one or more marketing or media funds, campaigns or cooperatives ("Marketing Funds") to serve such groupings of franchisees within or outside Canada, including Franchisee, as CJR, its affiliate or their respective designees may determine from time to time in view of the objectives of the particular Marketing Fund; and (2) require Franchisee to subscribe to or to participate in any such Marketing Fund and to share financially in the expense of the establishment, maintenance, operation and discontinuance of such Marketing Fund at rates and in proportions to be determined by CJR, its affiliate or their respective designees from time to time subject to the limitations in Section 3.C. CJR may require Franchisee to make payments toward any such subscription, participation or sharing arrangement by a fiscal period, quarterly, annually, as incurred or such other basis or timetable as CJR, its affiliate or their respective designees may determine from time to time. Franchisee shall comply fully with any requirement of CJR, its affiliate or their respective designees in respect of any such Marketing Fund and/or any such subscription, participation or sharing arrangement. CJR, its affiliate or their respective designees shall prepare annually a statement of the monies collected and costs incurred for advertising, marketing and public relations, research and related programs by any Marketing Fund and, within a reasonable period of time after a written request from Franchisee, CJR shall provide that statement to Franchisee.

CJR, its affiliate or their respective designees shall direct all advertising, marketing, and public relations programs and activities financed by the Marketing Funds, with sole discretion over the creative concepts, materials and endorsements used in those programs and activities, and the geographic, market and media placement and allocation of advertising and marketing materials. Franchisee agrees that the Marketing Funds may be used to pay the costs of preparing and producing such associated materials and programs as CJR, its affiliate or their respective designees may determine, including video, audio and written advertising materials; employing advertising agencies; sponsorship of sporting, charitable or similar events; administering regional and multi-regional advertising programs, including, without limitation, purchasing direct mail and other media advertising and employing advertising agencies to assist with these efforts; hiring employees (whether full-time or part-time); and supporting public relations, market research and other advertising, promotional and marketing activities.

### D. Treatment of Payments to CJR or its Affiliate

CJR, its affiliate and their respective designees shall separately account for monies paid by Franchisee pursuant to Sections 5.B. and 5.C., but none of the monies need be segregated from CJR's other monies. None of these monies shall be used to defray any general operating expenses of CJR, its affiliate or their respective designees. CJR, its affiliate and their respective designees, however, will be reimbursed for expenses directly related to the Production Fund or any Marketing Fund programs including, without limitation, conducting market research, preparing advertising and marketing materials, collecting and accounting for contributions to each fund and administering the respective funds (including, without limitation, the cost of preparing and making all tax filings and other filings and reports and paying any required taxes). CJR, its affiliate and their respective designees may spend in any fiscal year an amount greater or less than the aggregate contribution of all Carl's Jr. Restaurants to the Production Fund or any Marketing Fund during that year or cause the Production Fund or any Marketing Fund to invest any surplus for future use by that fund. CJR, its affiliate and their respective designees will have the right to cause the Production Fund and any Marketing Fund to be incorporated or operated through an unrelated entity separate, and such successor entity shall have all rights and duties of CJR, its affiliate and their respective designees pursuant to this Section 5.

Franchisee acknowledges and agrees that the Production Fund and each Marketing Fund are intended to maximize general public recognition, acceptance and use of the Carl's Jr. System and the Proprietary Marks, and that CJR, its affiliate and their respective designees are not obligated, in administering the Production Fund and each Marketing Fund, to make expenditures for Franchisee that are equivalent or proportionate to its contributions thereto, or to ensure that any particular franchisee benefits directly or pro rata from any marketing expenditures.

CJR, its affiliate and their respective designees reserve the right, in their sole discretion, to: (1) suspend contributions to and operations of the Production Fund or any Marketing Fund for one or more periods that it or they determine to be appropriate; (2) terminate the Production Fund or any Marketing Fund upon 30 days' written notice to Franchisee and establish, if CJR, its affiliate or their respective designees so elect, one or more new advertising funds; and (3) upon the written request of any restaurant, defer or waive, in whole or in part, any advertising fees required by this Section if, in the sole judgment of CJR, there has been demonstrated unique, objective circumstances justifying any such waiver or deferral. On termination of the Production Fund or any Marketing Fund, all monies in the applicable fund shall be spent for advertising and/or promotional purposes. CJR, its affiliate and their designees have the right to reinstate any terminated fund upon the same terms and conditions set forth in this Agreement following 30 days' prior written notice to Franchisee.

### E. Local Store Marketing

(1) Franchisee shall spend for approved local store marketing ("LSM") the difference between Franchisee's APO and the amount Franchisee contributes pursuant to Sections 5.B. and 5.C. Qualified LSM shall include only those expenditures that are both actually made by Franchisee on marketing approved or mandated by CJR for the Franchised Restaurant and duly documented according to CJR's guidelines, but in no case shall qualified LSM include any expenses in connection with the provision of free or discounted food, employee incentive programs, charitable contributions, payments in connection with permanent on-premises menu boards, signage, lighting, yellow pages or business directory listings, entertainment discount books, purchase or maintenance of vehicles or such other types of expenses as CJR may from time to time determine.

(2) Franchisee may choose the subject matter and timing of its LSM expenditures over the course of any given calendar year so long as Franchisee: (a) does so in a manner reasonably likely to facilitate the success of the Franchised Restaurant; (b) is in compliance with its obligations under Sections 5.B. and 5.C. to contribute to or participate in the Production Fund and any Marketing Fund; (c) uses only marketing that (i) is approved by CJR, its affiliate or their respective designees; (ii) complies with all marketing guidelines that CJR, its affiliate or their respective designees may from time to time establish; (iii) is obtained from sources acceptable to CJR; (iv) complies with applicable Canadian laws and regulations; (v) to the satisfaction of CJR, is of high quality and in good taste; and (vi) does not attack or defame any person, infringe on the privacy of any person, attack any competitor of CJR or Franchisee, infringe on any person's intellectual property (including trade names, trademarks and copyrights) or include or involve material inconsistent with the public image of Carl's Jr. Restaurants, the Carl's Jr. System, CJR or its affiliates. Any expenditure by Franchisee on marketing for the Franchised Restaurant that does not meet these marketing standards to the satisfaction of CJR shall be excluded from qualified LSM.

(3) CJR shall exclusively own all copyrights in and to all marketing materials prepared by or for Franchisee in connection with the Franchised Restaurant, the Carl's Jr. System, any Proprietary Mark or CJR. Franchisee shall execute any and all documents requested by CJR to perfect and evidence that ownership. In addition, Franchisee will obtain, from the authors of any advertising materials, a written waiver of any moral or similar rights.

(4) Promptly (but in no case later than 10 days) after any request by CJR, Franchisee shall provide CJR or its designee copies of all documentation demonstrating the amount and types of marketing expenditures by Franchisee during any fiscal period, calendar quarter or calendar year.

## 6. OPERATION PROCEDURES MANUAL

CJR shall loan Franchisee during the term of this Agreement one copy of, or provide electronic access to, the confidential and proprietary OPM which contains information and knowledge that is unique, necessary and material to the Carl's Jr. System. (As used in this Agreement, the term "OPM" also includes all written correspondence from CJR regarding the System, other publications, materials, drawings, memoranda, videotapes, CDs, DVDs, audio tapes, and electronic media that CJR from time to time may provide to Franchisee.) The OPM may be supplemented or amended from time to time by letter, electronic mail, bulletin, videotapes, audio tapes, CDs, DVDs, software or other communications concerning the Carl's Jr. System to reflect changes in the image, specifications and standards relating to developing, equipping, furnishing and operating a Carl's Jr. Restaurant. Franchisee shall at all times keep its copy of the OPM current with all updates (*i.e.*, changes, additions, deletions, amendments, modifications, supplements, replacements) provided by or on behalf of CJR and shall purchase any equipment and related services (including, without limitation, a video cassette recorder, computer system, Internet service, dedicated phone line, facsimile machine, etc.) as CJR may from time to time determine to be necessary or desirable for Franchisee to receive, use, store, or retrieve the OPM. CJR may deliver the OPM or any portion thereof or update thereto, in any manner or medium CJR may from time to time determine is appropriate, including, without limitation, by mail, electronic mail, courier, bulletin, videotapes, CDs, DVDs, audio tapes, software, Internet, Intranet or otherwise, and establish terms of use for access to any restricted portion of CJR's website. Franchisee shall treat the OPM as confidential and proprietary information. The OPM and all copyrights are the sole property of CJR, notwithstanding any assistance by Franchisee in modifying the OPM. If a dispute relating to the contents of the OPM develops, the master copy maintained by CJR at its principal offices shall control.

The OPM contains detailed standards, specifications, instructions, requirements, methods and procedures for management and operation of the Franchised Restaurant. The OPM also may relate to the selection, purchase, storage, preparation, packaging, ingredients, recipes, service and sale of all products and beverages sold at the Franchised Restaurant; management and employee training; marketing, advertising and sales promotions; maintenance and repair of the Franchised Restaurant building, grounds, equipment, graphics, signs, interior and exterior decor items, fixtures and furnishings; employee dress attire and appearance standards; menu concept and graphics; and accounting, bookkeeping, records retention and other business systems, procedures and operations. Franchisee agrees at all times to operate the Franchised Restaurant in strict conformity with the OPM; to maintain the OPM at the Franchised Restaurant; to not reproduce the OPM or any part of it; and to treat the OPM as confidential and proprietary, and; to disclose the contents of the OPM only to those employees of Franchisee who have a need to know.

## 7. MODIFICATIONS OF THE SYSTEM

**A.** CJR, in its sole discretion, shall be entitled from time to time to change or modify the Carl's Jr. System, including modifications to the OPM, the menu and menu formats, the required equipment, the signage, the building and premises of the Franchised Restaurant (including the trade dress, decor and color schemes), the presentation of the Proprietary Marks, the adoption of new administrative forms and methods of reporting and of payment of any monies owed to CJR (including electronic means of reporting and payment) and the adoption and use of new or modified Proprietary Marks or copyrighted materials. Franchisee shall accept and use or display in the Franchised Restaurant any such changes or modifications in the Carl's Jr. System as if they were a part of the Carl's Jr. System at the time this Agreement was executed, and Franchisee will make such expenditures as the changes or modifications in the Carl's Jr. System may reasonably require.

**B.** Within 30 days after receipt of written notice from CJR, Franchisee shall begin selling any newly authorized menu items and cease selling any menu items that are no longer authorized. All food, beverage and merchandise items authorized for sale at the Franchised Restaurant shall be offered for sale under the specific name designated by CJR. CJR, in its sole discretion, may restrict sales of menu items to certain time periods during the day. Franchisee shall establish menu prices in its sole and absolute discretion. If Franchisee has a suggestion for a new menu item or for a change to an authorized menu item or Franchisee

desires to participate in a test market program, Franchisee shall provide CJR written notice prior to implementation. Franchisee shall not add or modify any menu item or participate in a test market program without first having obtained CJR's prior written approval. Franchisee shall purchase any additional equipment and smallwares as CJR deems reasonably necessary in connection with new menu items. If CJR requires Franchisee to begin offering a new menu item which requires the purchase of additional equipment, a reasonable period of time, as determined in the sole discretion of CJR, shall be provided for the financing, purchase and installation of any such equipment before such new menu items must be offered for sale at the Franchised Restaurant.

C.      Extensive structural changes, major remodeling and renovations, and substantial modifications to existing equipment and improvements to modernize and conform the Franchised Restaurant to the image of the Carl's Jr. System for new franchised and company restaurants shall be required at CJR's request (but not more often than every 5 years). Capital expenses necessary for the repair and maintenance of the Franchised Location are not subject to the time limitations described in the preceding sentence. Within 60 days after receipt of CJR's written notice regarding the required modernization, Franchisee shall prepare and complete drawings and plans for the required modernization. These drawings and plans must be submitted to, and their use approved by, CJR prior to the commencement of work. Franchisee shall complete the required modernization within the time reasonably specified by CJR in its written notice.

D.      CJR has the right, in its sole discretion, to waive, defer or permit variations from the standards of the Carl's Jr. System or the applicable agreement to any franchisee or prospective franchisee based on the peculiarities of a particular site, existing building configuration or circumstance, density of population, business potential, trade area population or any other condition or circumstance. CJR shall have the right, in its sole discretion, to deny any such request CJR believes would not be in the best interests of the Carl's Jr. System.

E.      If Franchisee develops any new concepts, processes or improvements relating to the Carl's Jr. System, whether or not pursuant to a CJR authorized test, Franchisee promptly shall notify CJR and provide CJR with all information regarding the new concept, process or improvement, all of which shall become the property of CJR and its affiliates and which may be incorporated into the Carl's Jr. System without any payment to Franchisee. Franchisee, at its expense, promptly shall take all actions deemed necessary or desirable by CJR to vest in CJR ownership of such concepts, processes or improvements.

F.      Franchisee shall submit for review and approval by CJR from time to time any modifications to the Carl's Jr. System, including the OPM, which Franchisee reasonably believes to be necessary to comply with Canadian legal requirements or for the commercial success of the Franchised Restaurant in Canada. CJR agrees to consider each proposed modification and to notify Franchisee whether CJR has approved or disapproved each proposed modification, specifying the reasons for any rejection. If CJR approves any modification to the OPM, such modification shall be deemed incorporated into the OPM for purposes of this Agreement. Franchisee shall diligently and fully implement and remain in full compliance with the Carl's Jr. System (as modified from time to time).

8.      TRAINING

A.      Franchise Management Training Program

CJR shall provide Franchisee and certain designated employees the Franchise Management Training Program ("FMTP") in the operation of a Carl's Jr. Restaurant at those times and those places designated by CJR (which may include training outside of Canada). The FMTP will include classroom instruction and training at CJR's designated training facilities and at a Carl's Jr. Restaurant designated by CJR. Franchisee (or, if Franchisee is owned by more than one individual, Franchisee's Operating Principal, defined in Section 13.F.), Franchisee's restaurant manager and any other person designated by CJR shall attend and satisfactorily complete each element of the FMTP. Franchisee agrees that at least 3 employees of Franchisee shall attend and successfully complete the FMTP.

Franchisee shall pay CJR, for each person attending the FMTP, a tuition fee as established by CJR from time to time. Franchisee will be required to pay all travel, living and other expenses incurred by Franchisee's employees while attending the training. CJR reserves the right to dismiss from the training program any person whom CJR does not believe will perform acceptably in the position for which he has been hired by Franchisee and Franchisee shall provide a suitable replacement within one month of such dismissal.

### B.    Additional Training

CJR shall have the right (which may be exercised at any time and in CJR's sole discretion) to require that Franchisee, the Operating Principal, Franchisee's Restaurant Manager and any other employees designated by CJR take and successfully complete other training courses in addition to the FMTP, as specified by CJR. CJR reserves the right to require Franchisee to pay a tuition fee for these additional training programs as established by CJR from time to time. Franchisee will be required to pay all travel, living and other expenses incurred by Franchisee's employees while attending the training.

### C.    Training by Franchisee

Franchisee shall conduct such initial and continuing training programs for its employees as CJR may require from time to time. If Franchisee operates at least one Carl's Jr. Restaurant, Franchisee may apply to CJR to offer the FMTP at its own training facility (which may be a Carl's Jr. Restaurant). Provided Franchisee meets CJR's standards to conduct the FMTP, Franchisee will be permitted to establish its own training facility (which may be a Carl's Jr. Restaurant) at which a designated training manager may conduct the FMTP for Franchisee's employees. Franchisee may offer the FMTP at its training facility only after the facility and the designated training manager have been certified by CJR. CJR may periodically visit and evaluate the training facility and the designated training manager to ensure that they continue to meet CJR's standards, and CJR may revoke its certification if the training facility or the designated training manager cease to meet those standards. Franchisee shall reimburse CJR for all travel, living and other expenses incurred by CJR in evaluating Franchisee's training facility.

## 9.    ADDITIONAL SERVICES BY CJR

In addition to the services described elsewhere in this Agreement, during the term of this Agreement, CJR shall make the following services available to Franchisee:

### A.    Pre-Opening Assistance

CJR shall provide consultation and advice to Franchisee as CJR deems appropriate at no additional cost with regard to construction or renovation and operation of the Franchised Restaurant, building layout, furnishings, fixtures and equipment plans and specifications, training, purchasing and inventory control and those other matters as CJR deems appropriate.

### B.    Opening of the Franchised Restaurant

Upon Franchisee's reasonable request, or at CJR's discretion, CJR shall provide assistance in opening the Franchised Restaurant and in training Franchisee's employees as CJR deems appropriate in light of Franchisee's needs and the availability of CJR personnel. CJR has the right to charge Franchisee a fee for the opening training support team depending on the level of support needed to open the Franchised Restaurant (as determined by CJR). If Franchisee has paid all the training fee, and the Franchised Restaurant is one of the first 2 Carl's Jr. Restaurants to be developed and opened by Franchisee, a CJR All-Star Opening Training Support Team shall provide assistance in opening the Franchised Restaurant and in training the Franchised Restaurant's employees.

C.      **Post-Opening Assistance**

CJR periodically, as it deems appropriate, shall advise and consult with Franchisee in connection with the operation of the Franchised Restaurant. CJR, as it deems appropriate, shall provide to Franchisee its knowledge and expertise regarding the Carl's Jr. System and pertinent new developments, techniques and improvements in the areas of restaurant design, management, food and beverage preparation, sales promotion, service concepts and other areas. CJR may provide these services through visits by CJR's representatives to the Franchised Restaurant or Franchisee's offices, the distribution of printed or filmed material or electronic information, meetings or seminars, telephone communications, email communications or other communications.

D.      **CJR's Right to Inspect the Franchised Restaurant**

To determine whether Franchisee and the Franchised Restaurant are in compliance with this Agreement and with all specifications, quality standards and operating procedures prescribed by CJR for the operation of Carl's Jr. Restaurants, CJR or its designees shall have the right at any reasonable time and without prior notice to Franchisee to: (1) inspect the Franchised Location; (2) observe and (subject to receipt of any necessary consents) photograph and videotape the operations of the Franchised Restaurant for such consecutive or intermittent periods as CJR deems necessary; (3) remove samples of any food and beverage product, material or other products for testing and analysis (without paying for the samples); (4) interview personnel of the Franchised Restaurant; (5) interview customers of the Franchised Restaurant; and (6) inspect and copy any books, records and documents relating to the operation of the Franchised Restaurant or, upon the request of CJR or its designee, require Franchisee to send copies thereof to CJR or its designee.

Franchisee agrees to cooperate fully with CJR or its designee in connection with any such inspections, observations, videotaping, product removal and interviews (collectively, "QA Audit") and further agrees to reimburse CJR for all reasonable costs and expenses incurred in connection with those QA Audits at the Franchised Restaurant, not to exceed 2 QA Audits per calendar year. Licensee shall pay such amounts to CJR within 10 days after receipt of an invoice from CJR

Franchisee shall take all necessary steps to immediately correct any deficiencies detected during these inspections, including, without limitation, ceasing further sale of unauthorized menu items and ceasing further use of any equipment, advertising materials or supplies that do not conform with the standards and requirements promulgated by CJR from time to time. Franchisee shall present to its customers such evaluation forms as are periodically prescribed by CJR and shall participate and/or request its customers to participate in any surveys performed by or on behalf of CJR as CJR may direct.

E.      **Delegation**

CJR has the right, from time to time, to delegate the performance of any portion or all of its obligations and duties under this Agreement to designees, including, but not limited to, CJR's corporate parents, affiliates or agents or independent contractors with which CJR has contracted to perform CJR's obligations or duties.

F.      **Procurement and Logistical Support**

CJR shall from time to time provide technical consultation and advice regarding the sourcing, procurement, use or suitability of any local materials, content, food or beverage products, supplies, equipment or other goods or services, including without limitation, logistical support, from or available on or to the local market; provided that whether or not CJR provides any such assistance or consultation, all such goods and services shall comply in all material respects with such standards and requirements as CJR may from time to time establish.

10.    **PERFORMANCE STANDARDS AND UNIFORMITY OF OPERATION**

Products sold and services performed under the Proprietary Marks have a reputation for quality. This reputation has been developed and maintained by CJR, its predecessors and affiliates, and it is of the utmost importance to CJR, its corporate parents, subsidiaries and affiliates, Franchisee and all other franchisees of CJR that this reputation be maintained. In recognition of the mutual benefits that come from maintaining the reputation for quality enjoyed by the Carl's Jr. System, Franchisee covenants and agrees, with respect to the operation of the Franchised Restaurant, that Franchisee and its employees shall comply with all of the requirements of the Carl's Jr. System as set forth in the OPM or otherwise, and Franchisee additionally shall comply with the following:

A.    **Standards, Specifications and Procedures**

Franchisee acknowledges that each and every detail of the appearance, layout, decor, services and operation of the Franchised Restaurant is important to CJR and other Carl's Jr. Restaurants. Franchisee agrees to cooperate with CJR by maintaining these high standards in the operation of the Franchised Restaurant. Franchisee further agrees to comply with all Carl's Jr. System specifications, recipes, standards and operating procedures (whether contained in the OPM or any other written communication to Franchisee) relating to the appearance, function, cleanliness and operation of a Carl's Jr. Restaurant, including, but not limited to: **(1)** type, quality, taste, weight, dimensions, ingredients, uniformity, manner of preparation, and sale of all food products and beverages sold at the Franchised Restaurant and all other products used in the packaging and sale of those products and beverages; **(2)** sales and marketing procedures and customer service; **(3)** advertising and promotional programs; **(4)** layout, decor and color scheme of the Franchised Restaurant; **(5)** appearance and dress of employees; **(6)** safety, maintenance, appearance, cleanliness, sanitation, standards of service, and operation of the Franchised Restaurant; **(7)** submission of requests for approval of brands of products, supplies and suppliers; **(8)** use and illumination of signs, posters, displays, standard formats and similar items; **(9)** identification of Franchisee as the owner of the Franchised Restaurant; **(10)** types of fixtures, furnishings, equipment, smallwares and packaging; and **(11)** the make, type, location and decibel level of any game, entertainment or vending machine. Mandatory specifications, standards and operating procedures, including upgraded or additional equipment, that CJR prescribes from time to time in the OPM or otherwise communicates to Franchisee in writing, shall constitute provisions of this Agreement as if fully set forth in this Agreement.

B.    **Approved Products, Distributors and Suppliers**

Franchisee acknowledges that the reputation and goodwill of Carl's Jr. Restaurants are based upon, and can only be maintained by, the sale of distinctive, high quality food products and beverages, and the presentation, packaging and service of such products and beverages in an efficient and appealing manner. CJR, its predecessors and its affiliates may develop certain proprietary food products that will be prepared by or for CJR according to CJR's proprietary special recipes and formulas. CJR, its predecessors and its affiliates also have developed standards and specifications for other food products, ingredients, seasonings, mixes, beverages, materials and supplies incorporated or used in the preparation, cooking, serving, packaging and delivery of prepared food products authorized for sale at Carl's Jr. Restaurants. Franchisee agrees that the Franchised Restaurant will: **(1)** purchase those food products developed by CJR pursuant to a special recipe or formula only from CJR, an affiliate of CJR or a third party designated and licensed by CJR to prepare and sell such products; and **(2)** purchase from manufacturers, distributors, vendors and suppliers (collectively "suppliers") approved by CJR all other goods, food products, ingredients, spices, seasonings, mixes, beverages, materials and supplies used in the preparation of products (collectively "goods"), as well as advertising materials furniture, fixtures, equipment, smallwares, menus, forms, paper and plastic products, packaging or other materials (collectively "materials") that meet the standards and specifications promulgated by CJR from time to time. CJR has the right to require that Franchisee use only certain brands and to prohibit Franchisee from using other brands. CJR may from time to time modify the list of approved brands and/or suppliers, and Franchisee shall not, after receipt of such modification in writing, reorder any brand from any supplier that is no longer approved.

CJR may approve one or more suppliers for any goods or materials and may approve a supplier only as to certain goods or materials. CJR may concentrate purchases with one or more suppliers to obtain lower prices and/or the best advertising support and/or services for any group of Carl's Jr. Restaurants or any other group of restaurants franchised or operated by CJR or its affiliates. Approval of a supplier may be conditioned on requirements relating to the frequency of delivery, reporting capabilities, standards of service, including prompt attention to complaints, or other criteria, and concentration of purchases, as set forth above, and may be temporary pending a further evaluation of such supplier by CJR. CJR may establish commissaries and distribution facilities owned and operated by CJR or an affiliate that CJR shall designate as an approved supplier.

If Franchisee proposes to purchase any goods or materials (that Franchisee is not required to purchase from CJR, an affiliate of CJR or a designated supplier) from a supplier that CJR has not previously approved, Franchisee shall submit to CJR a written request for such approval, or shall request the supplier to do so itself. CJR has the right to require, as a condition of its approval, that its representatives be permitted to inspect the supplier's facilities, and that such information, specifications and samples as CJR reasonably designates be delivered to CJR and/or to an independent, certified laboratory designated by CJR for testing prior to granting approval. A charge not to exceed the reasonable cost of the inspection and the actual cost of the test shall be paid by Franchisee. CJR reserves the right, at its option, to re-inspect the facilities and products of any such approved supplier and to revoke its approval upon the supplier's failure to continue to meet any of the foregoing criteria.

Franchisee shall at all times maintain an inventory of approved goods and materials sufficient in quality and variety to realize the full potential of the Franchised Restaurant. CJR may, from time to time, conduct market research and testing to determine consumer trends and the salability of new food products and services. Franchisee agrees to cooperate in these efforts by participating in CJR's customer surveys and market research programs if requested by CJR. All customer surveys and market research programs will be at CJR's sole cost and expense, unless such survey or program has been approved by Franchisee and Franchisee has approved its proportionate cost. Franchisee shall not be allowed to test anything without first being requested by CJR to do so and signing a test letter agreement in a form satisfactory to CJR.

**CJR and its affiliates disclaim all express or implied warranties concerning any approved goods, materials or services, including, without limitation, any warranties as to merchantability, fitness for a particular purpose, availability, quality, pricing or profitability. Franchisee acknowledges that CJR and its affiliates may, under appropriate circumstances, receive fees, commissions, field-of-use license royalties, or other consideration from approved suppliers based on sales to franchisees, and that CJR may charge non-approved suppliers reasonable testing or inspection fees.**

C.    Menu Boards and Formats

CJR shall have the right to prescribe, and subsequently vary, one or more menu boards and formats to be utilized in the Franchised Restaurant. The menu boards and formats may include requirements concerning organization, graphics, product descriptions, illustrations and other matters (except prices) related to the menu. Prescribed menu boards and formats may vary depending on region, market size or other factors deemed relevant by CJR. If any menu board and format utilized by Franchisee ceases to be an authorized menu board and format, Franchisee shall have a reasonable period of time (not to exceed 6 months) to discontinue use of the old menu board and format and begin using an authorized menu board and format.

D.    Required Hardware, Peripherals, Software and Systems

Franchisee agrees to procure and install such data processing equipment, computer hardware and software, required dedicated telephone and power lines, high speed Internet connections, modems, printers, systems (including without limitation point of sale and cash and data capture/retrieval systems) and other computer-related or communications accessory or peripheral equipment as CJR specifies in the OPM or otherwise. All of the foregoing must be able to provide CJR that information, in that format/medium, as CJR

reasonably may specify from time to time. Franchisee shall provide all assistance required by CJR to bring Franchisee's computer-related systems on-line with the computer-related systems designated by CJR and maintained by CJR or its affiliates at the earliest possible time. Franchisee agrees that CJR shall have the free and unfettered right to retrieve any data and information from Franchisee's computer-related systems as CJR, in its sole discretion, deems appropriate, including electronically polling the daily sales, menu mix and other data of the Franchised Restaurant. All of the hardware, software and other items specified to be installed or purchased, or activities Franchisee is to accomplish, and the delivery of all hardware, software and other items, shall be at Franchisee's expense. Franchisee shall, at its sole expense, ensure that Franchisee's computer-related systems comply with all applicable data security, privacy, tax and other applicable laws, regulations and standards.

Franchisee shall: (1) use the proprietary software program, system documentation manuals and other proprietary materials now and hereafter provided to Franchisee by CJR (or a CJR-approved supplier) in connection with the operation of the Franchised Restaurant; (2) if requested by CJR, execute a standard software license agreement or similar agreement with CJR or its affiliates; (3) input and maintain in Franchisee's computer-related systems such data and information as CJR prescribes in the OPM, software programs, documentation or otherwise; (4) purchase new or upgraded software programs, system documentation manuals and other proprietary materials at then-current prices whenever adopted system-wide by CJR; and (5) return all materials obtained from CJR and its affiliates to CJR in good condition, excepting normal wear and tear, upon termination or expiration of this Agreement.

Franchisee acknowledges that computer-related systems are designed to accommodate a finite amount of data and that those systems become obsolete as technological advances continue. As these limits are reached, or as technology advances, CJR may, in its sole discretion, mandate that Franchisee: (a) add memory, ports and other accessories or peripheral equipment or additional, new or substitute software to the original computer-related system acquired by Franchisee; and (b) replace or upgrade the entire computer-related system with a larger system capable of assuming and discharging the computer-related tasks and functions specified by CJR. Franchisee also acknowledges that computer designs and functions change periodically and that CJR may desire to make substantial modifications to its computer specifications or to require installation of entirely different systems during the term of this Agreement or upon renewal of this Agreement.

In addition to the other requirements of this Section 10.D., Franchisee agrees, at its expense, to keep its computer-related systems in good maintenance and repair and to make additions, changes, modifications and substitutions to its computer-related systems, and replacement of its computer-related systems, as directed by CJR, and on the dates and within the times specified by CJR in its sole discretion.

CJR cannot and does not warrant or represent that all items required by this Section 10.D. will be available and operational in Canada or at the Franchised Location, whether due to unique local operating or technical circumstances or otherwise. Franchisee shall promptly notify CJR if, after a diligent search, any required item is unavailable in Canada or at the Franchised Location and, in such notice, indicate the nature and expected duration of the unavailability. CJR and Franchisee shall then consult regarding this matter and Franchisee shall procure at its sole expense solutions to such situations as specified or accepted by CJR.

### E.    Upkeep of the Franchised Restaurant

Franchisee shall constantly maintain and continuously operate the Franchised Restaurant and all furniture, fixtures, equipment, furnishings, floor coverings, interior and exterior signage, the building interior and exterior, interior and exterior lighting, landscaping and parking lot surfaces in first-class condition and repair in accordance with the requirements of the Carl's Jr. System, including all ongoing necessary remodeling, redecorating, refurbishing and repairs. In addition, Franchisee shall promptly and diligently perform all necessary maintenance, repairs and replacements to the Franchised Restaurant as CJR may prescribe from time to time, including periodic interior and exterior painting; resurfacing of the parking lot; roof repairs; and replacement of obsolete or worn out signage, floor coverings, furnishings, equipment and decor.

Franchisee shall not make any material alterations to the Franchised Restaurant that affect operations or the image of the Carl's Jr. System without CJR's prior written approval. Franchisee acknowledges and agrees that the requirements of this Section are both reasonable and necessary to ensure continued public acceptance and patronage of Carl's Jr. Restaurants, to assist the Franchised Restaurant to compete effectively in the marketplace and to avoid deterioration or obsolescence of the operation of the Franchised Restaurant.

If Franchisee is leasing, or intends to lease, the Franchised Location, Franchisee will exercise reasonable efforts to ensure that the lease allows CJR to enter the premises for any purpose contemplated by this Agreement (including without limitation to make any modifications deemed necessary by CJR to protect any Proprietary Mark) and that Franchisee's landlord approves of CJR as a prospective sublessee or assignee of the lease in the event of any expiration, termination, extension or renewal of the lease or any renewal thereof. Upon execution of the lease, Franchisee shall provide CJR a copy of the lease and a written statement, in form and substance satisfactory to CJR, certifying that the lease complies with this Section 10.E.

### F.  Maximum Operation of the Franchised Restaurant

During the term of this Agreement, Franchisee shall use the Franchised Location solely for the operation of the Franchised Restaurant and shall maintain sufficient inventories, adequately staff each shift with qualified employees and continuously operate the Franchised Restaurant at its maximum capacity and efficiency for the minimum number of days and hours set forth in the OPM or as CJR otherwise prescribes in writing (subject to the requirements of local laws and licensing requirements).

Franchisee shall immediately resolve any customer complaints regarding the quality of food or beverages, service and/or cleanliness of the Franchised Restaurant or any similar complaints. When any customer complaints cannot be immediately resolved, Franchisee shall use best efforts to resolve the customer complaints as soon as practical and shall, whenever feasible, give the customer the benefit of the doubt. If CJR, in its sole discretion, determines that its intervention is necessary or desirable to protect the Carl's Jr. System or the goodwill associated with the Carl's Jr. System, or if CJR, in its sole discretion, believes that Franchisee has failed adequately to address or resolve any customer complaints, CJR may, without Franchisee's consent, resolve any complaints and charge Franchisee an amount sufficient to cover CJR's reasonable costs and expenses in resolving the customer complaints, which amount Franchisee shall pay CJR immediately on demand.

### G.  Franchised Restaurant Management and Personnel

The Franchised Restaurant shall at all times be under the on-site supervision of one of the following designated individuals who must meet, to the satisfaction of CJR, CJR's applicable training qualifications for their designated position: the Operating Principal, a Restaurant Manager, or for specific, limited periods of time as authorized by CJR, a Shift Leader. Franchisee must, at all times, employ at least 1 management person for the Franchised Restaurant who has successfully completed the FMTP. If, at any time, Franchisee ceases to employ 1 management person as described above, Franchisee has 30 days (from the date on which Franchisee has less than 1 specified management person) to hire and enroll a replacement person in the FMTP.

Franchisee (or, if Franchisee is owned by more than one individual, the Operating Principal) shall remain active in overseeing the operations of the Franchised Restaurant, including, without limitation, regular, periodic visits to the Franchised Restaurant and sufficient communications with CJR to ensure that the Franchised Restaurant's operations comply with the operating standards as promulgated by CJR from time to time in the OPM or otherwise in written or oral communications.

Franchisee shall hire all employees of the Franchised Restaurant and be exclusively responsible for the terms of their employment and compensation, and for the proper training of such employees in the operation of the Franchised Restaurant, in human resources and customer relations. Franchisee shall

establish at the Franchised Restaurant a training program for all employees that meets the standards prescribed by CJR.

Franchisee shall employ only suitable persons of good character and reputation who will at all times conduct themselves in a competent and courteous manner in accordance with the image and reputation of CJR and the Carl's Jr. System and, while on duty, comply with the dress attire, personal appearance and hygiene standards set forth in the OPM. Franchisee shall use its best efforts to ensure that Franchisee's employees maintain a neat and clean appearance and render competent and courteous service to all customers and fellow employees of the Franchised Restaurant.

### H.   Signs and Logos

Subject to local ordinances, Franchisee shall prominently display in and upon the land and buildings of the Franchised Restaurant interior and exterior signs and logos using the name "Carl's Jr.," without any prefix or suffix, and those other names, marks, advertising signs and logos, of such nature, form, color, number, location and size, and containing that material as CJR may from time to time direct. Franchisee shall not display in or upon the Franchised Location any sign, logo or advertising media of any kind to which CJR objects.

### I.   Amusement Equipment

Franchisee shall not permit at the Franchised Restaurant any juke box, vending or game machine, gum machine, game, ride, gambling or lottery device, coin or token operated machine, or any other music, film or video device not authorized by CJR.

### J.   Compliance with Laws and Good Business Practices

Franchisee shall secure and maintain in force in its name all required licenses, permits and certificates relating to the operation of the Franchised Restaurant. Franchisee shall timely pay all obligations relating to the Franchised Restaurant.

Franchisee shall operate the Franchised Restaurant in full compliance with all applicable laws, ordinances and regulations, including, without limitation, all laws or regulations governing or relating to the handling of food products, immigration and discrimination, occupational hazards and health insurance, employment laws, including, without limitation, workers' compensation insurance, unemployment insurance, and the withholding and payment of federal and provincial income taxes, social security taxes and sales taxes. Franchisee acknowledges that, since it, and not CJR, will be operating in Canada, Franchisee is in a better position to be knowledgeable with respect to the requirements of all applicable Canadian laws, ordinances and regulations. CJR makes no representation or warranty regarding the requirements of any applicable Canadian laws, ordinances and/or regulations that may be applicable to Franchisee and/or the Franchised Restaurant. Compliance with all applicable Canadian laws, ordinances and regulations is solely Franchisee's obligation, and CJR shall have no liability with respect to Franchisee's compliance with any applicable Canadian laws, ordinances and/or regulations.

All advertising and promotion by Franchisee shall be completely factual and shall conform to the highest standards of ethical advertising. Franchisee shall, in all dealings with Franchisee's customers, suppliers and the public, adhere to the highest standards of honesty, integrity, fair dealing and ethical conduct. Franchisee agrees to refrain from any business or advertising practice that may be injurious to the goodwill associated with the Proprietary Marks or the business of CJR or its affiliates, the Carl's Jr. System or other restaurants operated or franchised by CJR or its affiliates.

Franchisee shall notify CJR in writing within 5 days: (1) after the commencement of any action, suit or proceeding, or the issuance of any order, writ, injunction, award or decree of any court, agency, administrative tribunal or other governmental instrumentality, which may adversely affect the operation or

financial condition of Franchisee or the Franchised Restaurant; or (2) of any notice of violation of any law, ordinance or regulation relating to health or sanitation at the Franchised Restaurant.

### K.      Non-Cash Payment Systems

Franchisee shall accept debit cards, credit cards, stored value gift cards or other non-cash payment systems specified by CJR to enable customers to purchase authorized products and shall obtain all necessary hardware and/or software used in connection with these non-cash payment systems.  Franchisee shall reimburse CJR for all costs associated with such non-cash payment systems as they pertain to the Franchised Restaurant.

### L.      800 Number, Secret Shoppers

In order to (among other things) maintain and enhance the goodwill associated with the Proprietary Marks, the Carl's Jr. System and each Carl's Jr. Restaurant, Franchisee agrees to participate in programs initiated to verify customer satisfaction and/or Franchisee's compliance with all operational and other aspects of the Carl's Jr. System, including (but not limited to) an 800 number, secret shoppers or other programs as CJR may require.  CJR will share the results of these programs, as they pertain to the Franchised Restaurant, with Franchisee.  Franchisee will reimburse CJR for all costs related to the Franchised Restaurant associated with any and all of these programs.

## 11.     PROPRIETARY MARKS

The term "Proprietary Marks" as used in this Agreement refers to all words, symbols, insignia, devices, designs, trade names, service marks, or combinations thereof designated by CJR as identifying the Carl's Jr. System and the products sold and services provided in connection with the Carl's Jr. System.  CJR shall, from time to time, advise Franchisee as to any additions or deletions to the Proprietary Marks and Franchisee's right to use the Proprietary Marks shall be deemed modified by those additions or deletions.

Franchisee's right to use the Proprietary Marks (as identified in Appendix C) is limited to its use of the Proprietary Marks in the operation of the Franchised Restaurant at the Franchised Location and as expressly provided in this Agreement and the OPM.  Franchisee shall not use the Proprietary Marks on any vehicles without CJR's prior written approval. Franchisee shall not use the Proprietary Marks or any variations of the Proprietary Marks or marks or names confusingly similar to the Proprietary Marks in any manner not authorized by CJR or in any entity name and shall not use any other trade names or trademarks in conjunction with the Franchised Restaurant.  If local laws or ordinances require that Franchisee file an affidavit of doing business under an assumed name or otherwise make a filing indicating that the Proprietary Marks are being used as a fictitious or assumed name, Franchisee shall include in such filing or application an indication that the filing is made "as a franchisee of Carl's Jr. Restaurants LLC." Franchisee shall use the symbol ® with all registered marks and the symbol ™ with all pending registrations or other marks and designations as may be required by Canadian law or the law of the province where the Franchised Restaurant is located to signify CJR's registration and ownership of the Proprietary Marks.

Franchisee shall not use the Proprietary Marks in any Internet domain name or e-mail address, in the operation of any Internet web site, on a social networking site, in social media or other future technological avenue (collectively, "Social Media") without CJR's prior written consent.  CJR may grant or withhold its consent in its sole discretion and may condition its consent on such requirements as CJR deems appropriate, including, among other things, that Franchisee obtain CJR's written consent to: (A) any and all Internet domain names and home page addresses related to the Franchised Restaurant; (B) the proposed form and content of any web site related to the Franchised Restaurant; (C) Franchisee's use of any hyperlinks or other links; (D) Franchisee's use of any materials (including text, video clips, photographs, images and sound bites) in which any third party has an ownership interest; and (E) any proposed modification of Franchisee's web site. CJR may designate the form and content of Franchisee's web site and/or require that any such web site be hosted by CJR or a third party who CJR designates, using one or more web sites that CJR owns and/or controls.  CJR may charge Franchisee a fee for developing, reviewing and approving Franchisee's web site

and/or for hosting the web site. CJR may establish a Social Media policy and Franchisee must comply with any such Social Media policy, as modified from time to time, and any additional policies CJR issues. Any copyright in Franchisee's sites or pages on any Social Media are owned by CJR, and Franchisee must sign any documents that CJR reasonably deems necessary to affirm CJR's ownership of the copyright.

If CJR should elect to use a principal name other than "Carl's Jr." to identify the Carl's Jr. System, CJR may select another name and notify Franchisee to change all or some items bearing the Proprietary Marks to the new name within a reasonable period of time as determined by CJR without any liability to CJR and at Franchisee's sole expense, and Franchisee promptly shall adopt that name. Franchisee agrees that nothing in this Agreement gives it any right, title or interest in the Proprietary Marks (except the right to use the Proprietary Marks in accordance with the terms of this Agreement), that the Proprietary Marks are the sole property of CJR and its affiliates, that Franchisee shall not directly or indirectly contest the validity or ownership of the Proprietary Marks or CJR's right to license the Proprietary Marks, and that any and all uses by Franchisee of the Proprietary Marks and the goodwill arising therefrom shall inure exclusively to the benefit of CJR and its affiliates.

CJR and/or its predecessors have applied, or CJR is applying, for registration in Canada of the Proprietary Marks listed in Appendix C. Franchisee acknowledges that CJR and/or its predecessors have applied for, but as of the date of this Agreement, may not have received, registration of certain Proprietary Marks, that CJR may be unable to obtain registration of some or all of the Proprietary Marks for which application has been made, and that CJR shall incur no liability to Franchisee for any failure to obtain such registration. CJR may, at its sole discretion, obtain registration or additional registrations of any Proprietary Mark. Franchisee will not seek to register, reregister, assert claim to ownership of, license or allow others to use, or otherwise appropriate to itself any of the Proprietary Marks or any mark or name confusingly similar thereto, any name or mark of any product sold at the Franchised Restaurant, or the goodwill symbolized by any of the foregoing except to the extent this action inures to the benefit of, and has the prior written approval of, CJR. Any unauthorized use of the Proprietary Marks by Franchisee or attempt by Franchisee, directly or indirectly, to register the Proprietary Marks in any jurisdiction shall constitute a breach of this Agreement and an infringement of CJR's rights in and to the Proprietary Marks.

Franchisee promptly shall inform CJR in writing as to any infringement of the Proprietary Marks of which it has knowledge. Franchisee shall not make any demand or serve any notice, orally or in writing, or institute any legal action or negotiate, compromise or settle any controversy with respect to any such infringement without first obtaining CJR's written approval. CJR shall have the right, but not the obligation, to bring such action or take such steps as it may deem advisable to prevent any such infringement and to join Franchisee as a party to any action in which CJR is or may be a party and as to which Franchisee is or would be a necessary or proper party. Franchisee also shall promptly notify CJR of any litigation (including administrative or arbitration proceedings) of which Franchisee is aware instituted against CJR, its affiliates or Franchisee relating to the Proprietary Marks. Franchisee shall execute any and all instruments and documents, render such other assistance and do any acts and things as may, in the opinion of CJR's counsel, be necessary or advisable to protect and maintain CJR's interests in the Proprietary Marks, including, without limitation, CJR's interests in litigation or proceedings before any tribunal relating to the Proprietary Marks.

## 12.    INSURANCE

Franchisee shall, at all material times and throughout the Term, maintain in full force and effect such insurance – including, but not limited to, general liability, product liability, business interruption, workers' compensation and other forms of coverage (including, without limitation, insurance for personal injury, death, property damage, contractual liability, fire, extended coverage, civil disturbance, vandalism, malicious mischief, automotive and for all claims with respect to any violation of applicable laws or regulations) – as CJR may from time to time determine to be necessary or appropriate to cover any and all claims arising out of, in connection with, or in relation to this Agreement or any related agreement. Such insurance shall consist of one or more insurance policies issued by reputable insurance carriers approved in writing by CJR and contain the minimum liability coverages as CJR may from time to time prescribe.

All insurance policies that Franchisee is required to secure or maintain under this Agreement shall name CJR and its affiliates as additional insureds, contain a waiver of all subrogation rights against CJR and its affiliates, and their successors and assigns, and provide for not less than 30 days' notice to CJR of any material modification, decrease in amount or scope of coverage, or cancellation or expiration of the policy. Each year during the Term, before the anniversary of the execution of this Agreement, Franchisee shall furnish to CJR copies of the certificates of insurance or other proof of insurance as CJR may require to show that all insurance coverage is in force. The maintenance and proof of sufficient insurance coverage shall be the sole responsibility of Franchisee.

## 13.   ORGANIZATION OF FRANCHISEE

### A.   Representations

If Franchisee is an entity, Franchisee makes the following representations and warranties: (1) it is duly organized and validly existing under the jurisdiction of its formation; (2) it is qualified to do business in the jurisdiction in which the Franchised Restaurant is located; (3) execution of this Agreement and the development and operation of the Franchised Restaurant is permitted by its governing documents; and (4) unless waived in writing by CJR, the formation and governing documents of the entity shall at all times provide that the activities of Franchisee are limited exclusively to the development and operation of Carl's Jr. Restaurants and other restaurants operated by Franchisee that are franchised by CJR or its affiliates. Franchisee must complete attached Appendix B.

If Franchisee is an individual, or a partnership comprised solely of individuals, Franchisee makes the following additional representations and warranties:  (a) each individual has executed this Agreement; (b) each individual shall be jointly and severally bound by, and personally liable for the timely and complete performance and a breach of, each and every provision of this Agreement; and (c) notwithstanding any transfer for convenience of ownership pursuant to Section 15.D., each individual shall continue to be jointly and severally bound by, and personally liable for the timely and complete performance and a breach of, each and every provision of this Agreement.

### B.   Governing Documents

If Franchisee is an entity, copies of all governing documents designated by CJR have been furnished to CJR. When any of these governing documents are modified or changed, Franchisee promptly shall provide copies to CJR.

### C.   Ownership Interests

If Franchisee is an entity, all interests in Franchisee are owned as set forth in attached Appendix B. In addition, Franchisee shall maintain a current list of all direct and indirect owners of the entity. Franchisee shall comply with Section 15 prior to any change in ownership interests and shall update Appendix B as changes occur in order to ensure the information contained in Appendix B is true, accurate and complete at all times.

The requirements of this Section 13.C. shall apply only to Franchisee's Continuity Group (defined in Section 13.D.) if, as of the date of the first franchise-related agreement between Franchisee and CJR or one of its affiliates, Franchisee was a publicly-held entity. If Franchisee becomes a publicly-held entity after that date, it shall thereafter be required to update Appendix B only with respect to changes in ownership interests of members of the Continuity Group.

### D.    Continuity Group

If Franchisee is an entity, Appendix B lists those persons whom CJR and Franchisee have designated as Franchisee's "Continuity Group." In the event of any change in the Continuity Group or in the ownership interests of any member of the Continuity Group, Franchisee shall update Appendix B to reflect the change. The Continuity Group shall at all times own at least 51% of the ownership interests of Franchisee

### E.    Guarantees

All members of the Continuity Group shall jointly and severally guarantee Franchisee's payment and performance under this Agreement and shall bind themselves to the terms of this Agreement pursuant to the attached Guarantee and Assumption of Franchisee's Obligations ("Guarantee"). Unless Franchisee is a publicly-held entity, all of Franchisee's officers, directors and all holders of a legal or beneficial interest in Franchisee of 10% or more ("10% Owners") also shall jointly and severally guarantee Franchisee's payment and performance under this Agreement and also shall bind themselves to the terms of this Agreement pursuant to the attached Guarantee. Notwithstanding the foregoing, CJR reserves the right, in its sole discretion, to waive the requirement that some or all of the previously described individuals execute the attached Guarantee and/or limit the scope of the Guarantee. CJR reserves the right to require any guarantor to provide personal financial statements to CJR from time to time.

With respect to 10% Owners, Franchisee acknowledges that, unless otherwise agreed to in writing by CJR, it is CJR's intent to have individuals (and not entities) execute the Guarantee. Accordingly, if any 10% Owner is not an individual, CJR shall have the right to have the Guarantee executed by individuals who have only an indirect ownership interest in Franchisee. (By way of example, if a 10% Owner of Franchisee is a corporation, CJR has the right to require that the Guarantee be executed by individuals who have an ownership interest in that corporation and their spouses, if applicable.)

If Franchisee, any guarantor or any parent, subsidiary or affiliate of Franchisee holds any interest in other restaurants that are franchised by CJR or its affiliates, the party who owns that interest shall execute, concurrently with this Agreement, a form of cross-guarantee to CJR and its affiliates for the payment of all obligations for such restaurants, unless waived in writing by CJR in its sole discretion. For purposes of this Agreement, an affiliate of Franchisee is any company controlled, directly or indirectly, by Franchisee or Franchisee's parent or subsidiary.

### F.    Operating Principal

If Franchisee is an entity, Franchisee shall designate and retain an individual to serve as the Operating Principal. The Operating Principal as of the date of this Agreement is identified in Appendix B. The Operating Principal shall meet all of the following qualifications:

(1)    The Operating Principal shall have at least a 5% equity ownership interest in Franchisee or, if Franchisee is a limited partnership, in Franchisee's general partner, unless this requirement is modified by CJR in its sole discretion. This Section 13.F.(1) shall not apply if Franchisee was a publicly-held entity or a wholly-owned subsidiary of a publicly-held entity as of the date of the first franchise-related agreement between Franchisee and CJR.

(2)    The Operating Principal, at all times, shall be a member of the Continuity Group and, at a minimum, have full control over the day-to-day activities, including operations, of the Franchised Restaurant and those other restaurants (that are franchised by CJR or its affiliates) operated by Franchisee in the same geographic area as the Franchised Restaurant, including control over the standards of operation and financial performance.

(3)    The Operating Principal shall devote full-time and best efforts to supervising the operation of the Franchised Restaurant and those other restaurants (that are franchised by CJR or its affiliates) operated by Franchisee in the same geographic market as the Franchised Restaurant and shall not

engage in any other business or activity, directly or indirectly, that requires substantial management responsibility.

(4)    Unless waived in writing by CJR, the Operating Principal shall maintain his primary residence within a reasonable driving distance of the Franchised Restaurant.

(5)    The Operating Principal shall successfully complete the FMTP and any additional training required by CJR.

(6)    CJR shall have accepted the Operating Principal, and not have later withdrawn that acceptance.

If the Operating Principal no longer meets these qualifications, Franchisee must provide CJR written notice designating a qualified person to act as Operating Principal within 30 days after the date the prior Operating Principal ceases to be qualified. CJR shall advise Franchisee whether it has approved the new Operating Principal within a reasonable time after receipt of Franchisee's notice. If CJR does not approve the proposed Operating Principal, Franchisee will have 15 days from its receipt of notice of the decision to advise CJR in writing of another person who satisfies the preceding qualifications to act as Operating Principal.

## 14.    TRANSFERS BY CJR

CJR shall have the absolute, unrestricted right, exercisable at any time, to transfer and assign all or any part of its rights and obligations under this Agreement to any person or legal entity, including, but not limited to, its direct and indirect corporate parents or its affiliates, without giving notice to Franchisee and without the consent of Franchisee.

## 15.    TRANSFERS BY FRANCHISEE

A.    Franchisee understands and acknowledges that the rights and duties set forth in this Agreement are personal to Franchisee and that CJR has entered into this Agreement in reliance on Franchisee's business skill, financial capacity, personal character, experience and demonstrated or purported ability in developing and operating high quality foodservice operations. Accordingly, neither Franchisee nor any immediate or remote successor to any part of Franchisee's interest in this Agreement, nor any individual, partnership, corporation or other legal entity which directly or indirectly has an interest in Franchisee shall sell, assign, transfer, convey, give away, pledge, mortgage, or otherwise encumber any interest in Franchisee, this Agreement, the Franchise, the Franchised Restaurant, the assets of the Franchised Restaurant, the Franchised Location or any other assets pertaining to Franchisee's operations under this Agreement (collectively "Transfer") without the prior written consent of CJR.

Except as otherwise provided in this Agreement, any purported Transfer, by operation of law or otherwise, not having the prior written consent of CJR shall be null and void and shall constitute a material breach of this Agreement, for which CJR may terminate this Agreement without providing Franchisee an opportunity to cure the breach.

B.    Franchisee shall advise CJR in writing of any proposed Transfer, submit (or cause the proposed transferee to submit) a franchise application for the proposed transferee, and submit a copy of all contracts and all other agreements or proposals, and all other information requested by CJR, relating to the proposed Transfer. If CJR does not exercise its right of first refusal, the decision as to whether or not to consent to a proposed Transfer shall be made by CJR in its sole discretion and shall include numerous factors deemed relevant by CJR. These factors may include, but will not be limited to, the following:

(1)    The proposed transferee (and if the proposed transferee is other than an individual, such owners of an interest in the transferee as CJR may request) must demonstrate that it has extensive experience in high quality restaurant operations of a character and complexity similar to Carl's Jr.

Restaurants; meets the managerial, operational, experience, quality, character and business standards for a franchisee promulgated by CJR from time to time; possesses a good character, business reputation and credit rating; has an organization whose management culture is compatible with CJR's management culture; and has adequate financial resources and working capital to meet Franchisee's obligations under this Agreement.

(2)    The sales price shall not be so high, in CJR's reasonable judgment, as to jeopardize the ability of the transferee to develop, maintain, operate and promote the Franchised Restaurant and meet financial obligations to CJR, third party suppliers and creditors. CJR's decision with respect to a proposed Transfer shall not create any liability on the part of CJR: (a) to the transferee, if CJR consents to the Transfer, and the transferee experiences financial difficulties; or (b) to Franchisee or the proposed transferee, if CJR withholds consent to the Transfer. CJR, without any liability to Franchisee or the proposed transferee, has the right, in its sole discretion, to communicate and counsel with Franchisee and the proposed transferee regarding any aspect of the proposed Transfer.

(3)    All of Franchisee's accrued monetary obligations to CJR and its affiliates (whether arising under this Agreement or otherwise) and all other outstanding obligations related to the Franchised Restaurant (including, but not limited to, bills from suppliers, taxes, judgments and any required governmental reports, returns, affidavits or bonds) have been satisfied or, in the reasonable judgment of CJR, adequately provided for. CJR reserves the right to require that a reasonable sum of money be placed in escrow to ensure that all of these obligations are satisfied.

(4)    Franchisee is not then in material default of any provision of this Agreement or any other agreement between Franchisee and CJR or its affiliates, is in good standing as a franchisee with CJR and its affiliates, is not in default beyond the applicable cure period under any real estate lease, equipment lease or financing instrument relating to the Franchised Restaurant and is not in default beyond the applicable cure period with any vendor or supplier to the Franchised Restaurant.

(5)    Franchisee, all individuals who executed this Agreement and all guarantors of Franchisee's obligations must execute a general release and a covenant not to sue, in a form satisfactory to CJR, of any and all claims against CJR and its affiliates and their respective past and present officers, directors, shareholders, agents and employees, in their corporate and individual capacities, including, without limitation, claims arising under federal, provincial and local laws, rules and ordinances, and claims arising out of, or relating to, this Agreement, any other agreements between Franchisee and CJR or its affiliates and Franchisee's operation of the Franchised Restaurant and all other restaurants operated by Franchisee that are franchised by CJR or its affiliates.

(6)    Unless waived by CJR in its sole discretion, the transferee and those employees of the transferee designated by CJR shall complete the training provided in Sections 8.A.-B.

C.    If CJR consents to a proposed Transfer, prior to the Transfer becoming effective:

(1)    The transferor shall pay CJR a nonrefundable Transfer fee in an amount not to exceed U.S. $2,500 in connection with CJR's review of the Transfer application.

(2)    Franchisee and the proposed transferee shall execute, at CJR's election, either an assignment agreement and any amendments to this Agreement deemed necessary or desirable by CJR to reflect the Transfer and/or CJR's then-current standard form of franchise agreement for use in Canada for an initial term ending on the expiration date of the Initial Term of this Agreement. In either event, a guarantee of the type required by Section 13.E. shall be executed by those individuals identified in Section 13.E and the transferor and transferee shall execute those other documents and take those other actions as CJR may require to protect CJR's rights.

(3)    The transferor shall remain liable for all obligations to CJR incurred before the date of the Transfer and shall execute any and all instruments reasonably requested by CJR to evidence that liability.

**D.**    If Franchisee is an individual or a partnership and desires to Transfer this Agreement to an entity formed for the convenience of ownership, the requirements of Section 15.B. shall apply to such a Transfer; however, Franchisee will not be required to pay a Transfer fee. CJR's consent also will be conditioned on the following: **(1)** the entity must be newly organized; **(2)** prior to the Transfer, CJR must receive a copy of the documents specified in Section 13.B., and the transferee shall comply with the remaining provisions of Section 13; and **(3)** Franchisee must own all ownership interests in the entity or, if Franchisee is owned by more than one individual, each person shall have the same proportionate ownership interest in the entity as prior to the Transfer.

**E.**    Notwithstanding the provisions of Section 15.B., the issuance of options or the exercise of options pursuant to a qualified stock option plan or a qualified employee stock ownership plan shall not be considered a Transfer and shall not require the prior written consent of CJR; provided no more than a total of 49% of Franchisee's outstanding voting securities are subject to the qualified stock option plan or qualified employee stock ownership plan.

**F.**    If Franchisee was a publicly-held entity as of the date of the first franchise-related agreement between Franchisee and CJR or its affiliates, Section 15.B. shall be applicable to transfers of ownership interests in Franchisee only if the proposed Transfer would result in either: **(1)** 50% or more of Franchisee's voting securities being held by different shareholders than as of the date of the first franchise-related agreement between Franchisee and CJR or its affiliates; or **(2)** any change in ownership of Franchisee's voting securities whereby any existing shareholder of Franchisee acquires an additional 10% or more of Franchisee's voting securities; or **(3)** any change in the membership of the Continuity Group (unless such change is a permitted Transfer pursuant to Section 15.G.).

**G.**    Notwithstanding the provisions of Section 15.B., CJR agrees that certain Transfers shall be permitted without CJR's prior written consent, provided all of the following conditions are satisfied:

        **(1)**    The Transfer is a transfer of:

        **(a)**    An ownership interest in Franchisee of 20% less, provided that after the Transfer, the Continuity Group owns at least 66% of all ownership interests in Franchisee.

        **(b)**    Ownership interests in Franchisee following the death or permanent incapacity of a person with an ownership interest in Franchisee, provided that the Transfer is to the parent, sibling, spouse or children of that person or to a member of the Continuity Group.

        **(2)**    Franchisee provides CJR written notice of its intent to undertake the Transfer at least 30 days prior to the effective date of the Transfer, together with documents demonstrating that the Transfer meets the requirements of this Section.

        **(3)**    At the time of Franchisee's notice to CJR, Franchisee shall not be in default of this Agreement or any other agreements between Franchisee and CJR or its affiliates.

**H.**    Franchisee shall not grant any security interest in its business, the Franchised Restaurant, the Franchised Location or the assets used in the operation of the Franchised Restaurant without CJR's prior written consent, which will not be unreasonably withheld. CJR's consent may be conditioned, in its sole discretion, on the written agreement by the secured party that, in the event of a default by Franchisee under any agreement related to the security interest, CJR shall have the right and option (but not the obligation) to purchase the rights of the secured party upon payment of all sums then due to the secured party. If Franchisee (or any person with a direct or indirect interest in Franchisee) finances any part of the price paid in connection with the Transfer, the person or entity providing the financing must agree that all obligations of the proposed transferee and any security interests retained in the assets being transferred, will be subordinate to the proposed transferee's obligations to: **(1)** pay all amounts due to CJR and its affiliates; and **(2)** otherwise comply with this Agreement and all other agreements with CJR or its affiliates.

**I.**     Securities or partnership interests in Franchisee may be sold, by private or public offering, only with CJR's prior written consent (whether or not CJR's consent is required under any other provision of this Section), which consent shall not be unreasonably withheld.   In addition to the requirements of Section 15.B., prior to the time that any public offering or private placement of securities or partnership interests in Franchisee is made available to potential investors, Franchisee, at its expense, shall deliver to CJR a copy of the offering documents.   Franchisee, at its expense, also shall deliver to CJR an opinion of Franchisee's legal counsel and an opinion of one other legal counsel selected by CJR (both of which shall be addressed to CJR and in a form acceptable to CJR) that the offering documents properly use the Proprietary Marks and accurately describe Franchisee's relationship with CJR and/or its affiliates.   The indemnification provisions of Section 22 shall also include any losses or expenses incurred by CJR and/or its affiliates in connection with any statements made by or on behalf of Franchisee in any public offering or private placement of Franchisee's securities.

**J.**     If any party holding any interest in Franchisee or in this Agreement receives a bona fide offer (as determined by CJR in its reasonable discretion) from a third party or otherwise desires to undertake any Transfer that would require CJR's consent (other than a Transfer for convenience of ownership pursuant to Section 15.D. or a sale of ownership interests in Franchisee to a spouse, parent, child or sibling), it shall notify CJR in writing of the terms of the proposed Transfer, and shall provide such information and documentation relating to the proposed Transfer as CJR may reasonably require.   CJR or its designee may elect to purchase the interest that the seller proposes to Transfer any time within 30 days after receipt of written notification, and all documents and other information required by Section 15.B., by sending written notice to the seller that CJR or its designee intends to purchase the seller's interest on the same financial terms and conditions offered by the third party (except that CJR or its designee shall not be obligated to pay any finder's or broker's fees).   In purchasing the interest, CJR or its designee shall be entitled to set off any monies owed to CJR or its affiliates by Franchisee and CJR or its designee shall be entitled to all customary representations and warranties that the assets are free and clear (or, if not, accurate and complete disclosure) as to:  **(1)** ownership, condition and title; **(2)** liens and encumbrances; **(3)** environmental and hazardous substances; and **(4)** validity of contracts inuring to the purchaser or affecting the assets, whether contingent or otherwise.

If the offer to Franchisee involves assets in addition to this Agreement, the Franchised Location, the Franchised Restaurant and other restaurants operated by Franchisee that are franchised by CJR or its affiliates, Franchisee's notice to CJR shall state the cash value of that portion of the offer received by Franchisee relating to this Agreement, the Franchised Location, the Franchised Restaurant and those other restaurants.   If the proposed Transfer provides for payment of consideration other than cash or it involves intangible benefits, CJR or its designee may elect to purchase the interest proposed to be sold for the reasonable equivalent in cash.   If the parties are unable to agree within 30 days on the reasonable equivalent in cash of the non-cash part of the offer received by Franchisee or the cash value of that portion of the offer received by Franchisee relating to this Agreement, the Franchised Location, the Franchised Restaurant and those other restaurants, the amount shall be determined by two professionally certified appraisers, Franchisee selecting one and CJR or its designee selecting one.   If the higher appraisal is more than 10% greater than the other appraisal, the two appraisers shall select a third professionally certified appraiser who also shall determine the amount.   The average value set by the appraisers (whether two or three appraisers as the case may be) shall be conclusive and CJR or its designee may exercise its right of first refusal within 30 days after being advised in writing of the decision of the appraisers.   The cost of the appraisers shall be shared equally by the parties.

CJR's failure to exercise its right of first refusal shall not constitute consent to the proposed Transfer nor a waiver of any other provision of this Section 15 with respect to a proposed Transfer.   If CJR does not exercise its right of first refusal, Franchisee may not thereafter Transfer the interest at a lower price or on more favorable terms than those that have been offered to CJR.   CJR shall again be given a right of first refusal if a transaction does not close within 6 months after CJR elected not to exercise its right of first refusal.   In no event shall Franchisee offer the interest for sale or transfer at public auction, nor at any time shall an offer be made to the public to sell, transfer or assign, through any advertisement, either in the

newspapers or otherwise, without first having obtained the written consent of CJR to the auction or advertisement.

**K.**     CJR's consent to any Transfer shall not constitute a waiver of any claims CJR may have against the transferring party, nor shall it be deemed a waiver of CJR's right to demand exact compliance with any of the terms of this Agreement by the transferee, nor will it be deemed a waiver of CJR's right to consent to or withhold its consent to future Transfers.

## 16.    GENERAL RELEASE

Franchisee (on behalf of itself and its parents, subsidiaries and affiliates), all individuals who execute this Agreement and all guarantors of Franchisee's obligations under this Agreement   (collectively, "Releasors") freely and without any influence forever release and covenant not to sue CJR, its parents, subsidiaries, affiliates, predecessors and successors and their respective past and present officers, directors, shareholders, agents and employees, in their corporate and individual capacities, from any and all claims, demands, liabilities and causes of action of whatever kind or nature, whether known or unknown, vested or contingent, suspected or unsuspected (collectively "claims"), which any Releasor now owns or holds or may in the future own or hold based on, arising out of or relating to, in whole or in part, any fact, event, conduct or omission occurring on or before the date of this Agreement, including, without limitation, claims arising under federal, provincial and local laws, rules and ordinances, claims for contribution, indemnity and/or subrogation and claims arising out of, or relating to this Agreement and all other agreements between any Releasor and CJR or its parents, subsidiaries, affiliates, or predecessors, the sale of a franchise to any Releasor, the development and operation of the Franchised Restaurant and the development and operation of all other restaurants operated by any Releasor that are or were franchised by CJR or its parents, subsidiaries, affiliates or predecessors. Franchisee (on behalf of the Releasors) expressly agrees that fair consideration has been given by CJR for this release and fully understands that this is a negotiated, complete and final release of all claims. Franchisee (on behalf of the Releasors) also expressly agrees that, with respect to this release, any and all rights granted under Section 1542 of the California Civil Code are expressly waived, to the extent applicable. That Section reads as follows: "A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release which if known by him must have materially affected his settlement with the debtor."

## 17.    COVENANTS

### A.    Best Efforts

During the term of this Agreement, Franchisee and the Operating Principal shall devote their best efforts to the development, management and operation of the Franchised Restaurant.

### B.    Confidentiality

Franchisee acknowledges and agrees that:  (1) CJR owns all right, title and interest in and to the Carl's Jr. System; (2) the Carl's Jr. System consists of trade secrets and confidential and proprietary information and know-how that gives CJR a competitive advantage; (3) CJR has taken all measures necessary to protect the trade secrets and the confidentiality of the proprietary information and know-how comprising the Carl's Jr. System; (4) all material or other information now or hereafter provided or disclosed to Franchisee regarding the Carl's Jr. System is disclosed in confidence; (5) Franchisee has no right to disclose any part of the Carl's Jr. System to anyone who is not an employee of Franchisee; (6) Franchisee will disclose to its employees only those parts of the Carl's Jr. System that an employee needs to know; (7) Franchisee will have a system in place to ensure its employees keep confidential CJR's trade secrets and confidential and proprietary information, and, if requested by CJR, Franchisee shall obtain from those of its employees designated by CJR an executed Confidential Disclosure Agreement in the form prescribed by CJR; (8) Franchisee will not acquire any interest in the Carl's Jr. System; and (9) Franchisee's use or duplication of the Carl's Jr. System or any part of the Carl's Jr. System in any other business would

constitute an unfair method of competition, for which CJR would be entitled to all legal and equitable remedies, including injunctive relief, without posting security for costs.

Franchisee shall not, during the term of this Agreement or at any time thereafter, communicate or disclose any trade secrets or confidential or proprietary information or know-how of the Carl's Jr. System to any unauthorized person, or do or perform, directly or indirectly, any other acts injurious or prejudicial to any of the Proprietary Marks or the Carl's Jr. System.  Any and all information, knowledge, know-how and techniques, including all drawings, materials, equipment, specifications, recipes, techniques and other data that CJR or its affiliates designate as confidential shall be deemed confidential for purposes of this Agreement.

The term confidential information does not include: (a) information that is now or hereafter becomes publicly known through no fault of Franchisee or its affiliates or by any other person, firm or corporation affiliated with Franchisee; (b) information that was in Franchisee's possession before the date of this Agreement; and (c) information that comes into Franchisee's possession after the date of this Agreement from a source not under an obligation of secrecy to CJR.  As used in this Agreement, the phrase "publicly known" means readily accessible to the public in a written publication, and shall not include information which is available only by a substantial searching of the published literature and information the substance of which must be pieced together from a number of different publications and sources.  The burden of proving that information or skills and experience are not confidential information shall be on the party asserting such exclusion.

C.    **Restrictions**

(1)    Franchisee acknowledges and agrees that:    (a) pursuant to this Agreement, Franchisee will have access to valuable trade secrets, specialized training and confidential information from CJR and/or its affiliates regarding the development, operation, purchasing, sales and marketing methods and techniques of CJR and its affiliates and the Carl's Jr. System; (b) the Carl's Jr. System and the opportunities, associations and experience established and acquired by Franchisee under this Agreement are of substantial and material value; (c) in developing the Carl's Jr. System, CJR and its affiliates have made and continue to make substantial investments of time, technical and commercial research, effort and money; (d) CJR would be unable adequately to protect the Carl's Jr. System and its trade secrets and confidential and proprietary information against unauthorized use or disclosure and would be unable adequately to encourage a free exchange of ideas and information among operators of Carl's Jr. Restaurants if franchisees or developers were permitted to engage in the activities described in Section 17.C.(2)(a) or (b) or hold interests in the businesses described in Section 17.C.(2)(c) and (3); (e) all restaurants operating in a quick-serve format are substantial and direct competitors of the Carl's Jr. System; and (f) restrictions on Franchisee's right to hold interests in, or perform services for, businesses described in Section 17.C.(2)(c) and (3) will not unduly limit its activities.

(2)    Accordingly, Franchisee covenants and agrees that during the term of this Agreement, and for a continuous period of 2 years following its expiration, transfer or termination, Franchisee shall not, either directly or indirectly, for itself, or through, on behalf of, or in conjunction with, any person, firm, partnership, corporation, or other entity:

(a)    Divert or attempt to divert any business or customer, or potential business or customer, of any Carl's Jr. Restaurant to any competitor, by direct or indirect inducement or otherwise;

(b)    Knowingly employ or seek to employ any person then employed by CJR or any franchisee of CJR as a shift leader or higher, or otherwise directly or indirectly induce such person to leave his or her employment;

(c)    Own, maintain, operate, engage in, grant a franchise to, advise, help, make loans to, lease property to or have any interest in, either directly or indirectly, any restaurant business: (i) whose sales of Designated Entrée Items (as defined below) during any daypart are reasonably likely to

account collectively for 20% or more of the restaurant's sales of all entrée items during that daypart; (ii) that features or promotes any Designated Entrée Item in its advertising; or (iii) that operates in a quick-service format (with or without table service). For purposes of the previous sentence, the term "Designated Entrée Items" means any hamburger sandwich, chicken sandwich, breakfast sandwich and any other entrée item of a type designated by CJR as part of the Carl's Jr. System at any time during the term of this Agreement. During the term of this Agreement, there is no geographical limitation on this restriction. Following the expiration, transfer or termination of this Agreement, this restriction shall apply within a 2 mile radius of the Franchised Location or within a 2 mile radius of any then-existing Carl's Jr. Restaurant, except as otherwise consented to in writing by CJR. This restriction shall not apply to Franchisee's existing restaurant or foodservice operations, if any, which are identified in Appendix A, nor shall it apply to other restaurants operated by Franchisee that are franchised by CJR or its affiliates.

If any part of these restrictions is found to be unreasonable in time or distance, each month of time or mile of distance may be deemed a separate unit so that the time or distance may be reduced by appropriate order of the court to that deemed reasonable. If, at any time during the 2 year period following expiration, transfer or termination of this Agreement, Franchisee fails to comply with its obligations under this Section, that period of noncompliance will not be credited toward Franchisee's satisfaction of the 2 year obligation.

(3)    Franchisee acknowledges that the Franchised Location will itself acquire goodwill associated with the Carl's Jr. System and that it would be difficult for CJR to ascertain that Franchisee has no interest in the operation by a third party of a restaurant concept at that location that would, if operated by Franchisee, violate the restriction of this Section 17. Accordingly, Franchisee further covenants and agrees that, during the term of this Agreement and for a period of 2 years following the expiration or earlier termination of this Agreement, Franchisee will not, either directly or indirectly, for itself, or through, on behalf of, or in conjunction with any person, firm, partnership, corporation, or other entity, sell, assign, lease or transfer the Franchised Location to any person, firm, partnership, corporation, or other entity which Franchisee knows, or has reason to know, intends to operate a restaurant business at the Franchised Location that would violate Section 17.C.(2)(c) if operated by Franchisee. Franchisee, by the terms of any conveyance selling, assigning, leasing or transferring its interest in the Franchised Location, shall include these restrictive covenants as are necessary to ensure that a restaurant business that would violate Section 17.C.(2)(c) if operated by Franchisee is not operated at the Franchised Location for this 2 year period, and Franchisee shall take all steps necessary to ensure that these restrictive covenants become a matter of public record.

### D.    Modification

CJR shall have the right, in its sole discretion, to reduce the scope of any covenant in this Section 17 effective immediately upon Franchisee's receipt of written notice, and Franchisee agrees that it shall comply forthwith with any covenant as so modified, which shall be fully enforceable notwithstanding the provisions of Section 25.

### E.    Applicability

The restrictions contained in this Section 17 shall apply to Franchisee and all guarantors of Franchisee's obligations. With respect to guarantors, these restrictions shall apply for a 2-year period after any guarantor ceases to be the Operating Principal or an officer, stockholder, director, member of the Continuity Group and/or a 10% Owner and thus has no position with Franchisee. The restrictions contained in this Section 17 shall not apply to ownership of less than a 5% legal or beneficial ownership in the outstanding equity securities of any publicly held corporation by Franchisee or any guarantor of Franchisee's obligations. The existence of any claim Franchisee or any guarantor of Franchisee's obligations may have against CJR or its affiliates, whether or not arising from this Agreement, shall not constitute a defense to the enforcement by CJR of the covenants in this Section 17. The preceding sentence, however, does not constitute a waiver of any such claim.

At CJR's request, unless otherwise prohibited by applicable law, Franchisee will obtain covenants similar in substance to those set forth in this Section 17 from any of its stockholders, directors, officers or restaurant managers and from family members of guarantors.

### F.    Injunctive Relief

Franchisee acknowledges and agrees that violation of the covenants contained in this Section 17 will result in immediate and irreparable injury to CJR for which money damages are not an adequate remedy. Therefore, in addition to being responsible for any damages caused to CJR arising from Franchisee's violation of this Section 17, CJR shall be entitled to seek the entry of an injunction prohibiting any conduct by Franchisee in violation of this Section 17.

## 18.    TERMINATION

### A.    Termination Without Cure Period

In addition to the grounds for termination that may be stated elsewhere in this Agreement, CJR may terminate this Agreement, and the rights granted by this Agreement, upon written notice to Franchisee without an opportunity to cure upon the occurrence of any of the following events:

(1)    Franchisee ceases to continuously operate the Franchised Restaurant for a period in excess of 5 consecutive days, unless the closing is due to an act of God, fire or other natural disaster or CJR consents to the closing in advance.

(2)    Franchisee is insolvent or is unable to pay its creditors (including CJR); files a petition in bankruptcy, an arrangement for the benefit of creditors or a petition for reorganization; there is filed against Franchisee a petition in bankruptcy, an arrangement for the benefit of creditors or petition for reorganization, which is not dismissed within 60 days of the filing; Franchisee makes an assignment for the benefit of creditors; or a receiver or trustee is appointed for Franchisee and not dismissed within 60 days of the appointment.

(3)    Execution is levied against Franchisee's business or property; suit to foreclose any lien or mortgage against the premises or equipment of the Franchised Restaurant is instituted against Franchisee and is not dismissed within 60 days; or the real or personal property of the Franchised Restaurant shall be sold after levy thereupon by any sheriff, marshal or constable.

(4)    There is a material breach by Franchisee of any obligation under Section 17.

(5)    Any Transfer that requires CJR's prior written consent occurs without Franchisee's having obtained that prior written consent.

(6)    CJR discovers that Franchisee made a material misrepresentation or omitted a material fact in the information that was furnished to CJR in connection with its decision to enter into this Agreement.

(7)    Franchisee knowingly falsifies any report required to be furnished to CJR, makes any material misrepresentation in its dealings with CJR or fails to disclose any material facts to CJR.

(8)    Franchisee fails to open the Franchised Restaurant for business within 60 days after CJR first authorizes the opening of the Franchised Restaurant.

(9)    CJR makes a reasonable determination that continued operation of the Franchised Restaurant by Franchisee will result in an imminent danger to public health or safety.

(10)   Franchisee loses possession of the Franchised Location through its own fault or its failure to extend the lease for the Franchised Location through the Initial Term of this Agreement.

(11)   Franchisee, the Operating Principal, any stockholder, member, partner, director or officer of Franchisee, any member of the Continuity Group or any 10% Owner is convicted of, or pleads guilty to, an indictable offence; a crime involving moral turpitude; or any other crime or offense that is reasonably likely, in the sole opinion of CJR, to adversely affect CJR, its affiliates or the Carl's Jr. System.

(12)   Franchisee, the Operating Principal, any member of the Continuity Group or any 10% Owner remains in default beyond the applicable cure period under any other agreement with CJR or its affiliates (provided that, if the default is not by Franchisee, Franchisee is given written notice of the default and a 30 day period to cure the default), or Franchisee remains in default beyond the applicable cure period under any real estate lease, equipment lease, or financing instrument relating to the Franchised Restaurant, or Franchisee remains in default beyond the applicable cure period with any vendor or supplier to the Franchised Restaurant, or Franchisee fails to pay when due any taxes or assessments relating to the Franchised Restaurant or its employees, unless Franchisee is actively prosecuting or defending the claim or suit in a court of competent jurisdiction or by appropriate government administrative procedure or by arbitration or mediation conducted by a recognized alternative dispute resolution organization.

(13)   Franchisee fails, at any time, to remain in compliance with any representation, warranty or obligation under Section 29.G.-H. or Section 30.

### B.   Termination Following Expiration of Cure Period

(1)   Except for those items listed in preceding Section 18.A., Franchisee shall have 30 days after written notice of default from CJR within which to remedy the default and provide evidence of that remedy to CJR. If any such default is not cured within that time, this Agreement shall terminate without further notice to Franchisee effective immediately upon expiration of that time, unless CJR notifies Franchisee otherwise in writing. Notwithstanding the foregoing, if the default cannot be corrected within 30 days, Franchisee shall have such additional time to correct the default as reasonably required (not to exceed 90 days), provided that Franchisee begins taking the actions necessary to correct the default during the 30 day cure period and diligently and in good faith pursues those actions to completion. Franchisee will be in default under this Section 18.B.(1) for any failure to materially comply with any of the requirements imposed by this Agreement, the OPM or otherwise in writing, or to carry out the terms of this Agreement in good faith.

(2)   Notwithstanding the provisions of preceding Section 18.B.(1), if Franchisee defaults in the payment of any monies owed to CJR when such monies become due and payable and Franchisee fails to pay such monies within 10 days after receiving written notice of default, then this Agreement will terminate effective immediately upon expiration of that time, unless CJR notifies Franchisee otherwise in writing.

(3)   If Franchisee has received 2 or more notices of default within the previous 12 months, CJR shall be entitled to send Franchisee a notice of termination upon Franchisee's next default within that 12 month period under this Section 18.B. without providing Franchisee an opportunity to remedy the default.

(4)   In addition to the other provisions of this Section 18.B, if CJR reasonably determines that Franchisee becomes or will become unable to meet its obligations to CJR or its affiliates under this Agreement, CJR may provide Franchisee written notice to that effect and demand that Franchisee provide those assurances reasonably designated by CJR, which may include security or letters of credit for the payment of Franchisee's obligations to CJR and its affiliates. If Franchisee fails to provide the assurances demanded by CJR within 30 days after its receipt of written notice from CJR, this Agreement shall terminate without further notice to Franchisee effective immediately upon expiration of that time, unless CJR notifies Franchisee otherwise in writing.

C.    **Termination Following Inspection**

CJR shall have the right to periodically conduct inspections of the Franchised Restaurant to evaluate
Franchisee's compliance with the Carl's Jr. System and this Agreement. Following each inspection, CJR
will provide Franchisee an inspection report listing Franchisee's score on the inspection and those conditions
at the Franchised Restaurant that must be rectified. If Franchisee fails to achieve a passing score on an
inspection, the inspection report shall constitute a notice of default. If Franchisee fails to achieve a passing
score on the next inspection (which shall be conducted at least 30 days after Franchisee's receipt of the
inspection report for the prior inspection), CJR may terminate this Agreement, without opportunity to cure,
by providing Franchisee written notice of termination along with the inspection report.

D.    **Statutory Limitations**

If any valid, applicable law or regulation of a competent governmental authority with jurisdiction
over this Agreement requires a notice or cure period prior to termination longer than set forth in this Section,
this Agreement will be deemed amended to conform to the minimum notice or cure period required by the
applicable law or regulation.

**19.    OBLIGATIONS ON TERMINATION OR EXPIRATION**

Upon termination or expiration of this Agreement:

A.    Franchisee immediately shall cease operating the Franchised Restaurant.

B.    Franchisee immediately shall pay CJR and its affiliates all sums due and owing CJR or its
affiliates pursuant to this Agreement.

C.    Franchisee promptly shall return to CJR the OPM, any copies of the OPM and all other
materials and information furnished by CJR, and Franchisee promptly shall return to CJR, in good condition
and repair excepting normal wear and tear, all computer software, disks, tapes and other magnetic storage
media.

D.    Franchisee and all persons and entities subject to the covenants contained in Section 17 shall
continue to abide by those covenants and shall not, directly or indirectly, take any action that violates those
covenants.

E.    Franchisee immediately shall discontinue all use of the Proprietary Marks in connection with
the Franchised Restaurant and of any and all items bearing the Proprietary Marks; remove the Proprietary
Marks from the Franchised Restaurant and from clothing, signs, materials, motor vehicles and other items
owned or used by Franchisee in the operation of the Franchised Restaurant; cancel all advertising for the
Franchised Restaurant that contains the Proprietary Marks (including telephone directory listings); and take
such action as may be necessary to cancel any filings or registrations for the Franchised Restaurant that
contain any Proprietary Marks.

F.    Franchisee promptly shall make such alterations and modifications to the Franchised
Location as may be necessary to clearly distinguish to the public the Franchised Location from its former
appearance and also make those specific additional changes as CJR may request for that purpose. If
Franchisee fails to promptly make these alterations and modifications, CJR shall have the right (at
Franchisee's expense, to be paid upon Franchisee's receipt of an invoice from CJR) to do so without being
guilty of trespass or other tort.

G.    Franchisee shall furnish CJR, within 30 days after the effective date of termination or
expiration, evidence (certified to be true, complete, accurate and correct by an officer of Franchisee, or
another person authorized in Franchisee's organizational documents, if Franchisee is an entity) satisfactory to
CJR of Franchisee's compliance with Sections 19.A. through 19.F.

H.      Franchisee shall not, except with respect to a restaurant franchised by CJR or its affiliates which is then open and operating pursuant to an effective franchise agreement: **(1)** operate or do business under any name or in any manner that might tend to give the public the impression that Franchisee is connected in any way with CJR or its affiliates or has any right to use the Carl's Jr. System or the Proprietary Marks; **(2)** make, use or avail itself of any of the materials or information furnished or disclosed by CJR or its affiliates under this Agreement or disclose or reveal any such materials or information or any portion thereof to anyone else; or **(3)** assist anyone not licensed by CJR or its affiliates to construct or equip a foodservice outlet substantially similar to a Carl's Jr. Restaurant.

I.      CJR shall not, upon the expiration of this Agreement or the termination of this Agreement for any reason, be liable to Franchisee for compensation, reimbursement or damages of any kind due to the loss of prospective profits on anticipated sales or due to expenditures, investments, leases or commitments in connection with Franchisee's business or goodwill.

## 20.   OPTION TO PURCHASE

A.      Upon the expiration or termination of this Agreement for any reason, CJR will have the option to purchase from Franchisee some or all of the assets used in the Franchised Restaurant ("Assets"). CJR may exercise its option by giving written notice to Franchisee at any time following expiration or termination up until 30 days after the later of: **(1)** the effective date of termination or expiration; or **(2)** the date Franchisee ceases to operate the Franchised Restaurant. As used in this Section 20, "Assets" shall mean and include, without limitation, leasehold improvements, equipment, vehicles, furnishings, fixtures, signs and inventory (non-perishable products, materials and supplies) used in the Franchised Restaurant, and the real estate fee simple or the lease or sublease for the Franchised Location. CJR shall have the unrestricted right to assign this option to purchase the Assets. CJR shall be entitled to the entry of interlocutory and permanent orders of specific performance by a court of competent jurisdiction if Franchisee fails or refuses to timely meet its obligations under this Section 20. CJR or its assignee shall be entitled to all customary representations and warranties that the Assets are free and clear (or, if not, accurate and complete disclosure) as to: **(A)** ownership, condition and title; **(B)** liens and encumbrances; **(C)** environmental and hazardous substances; and **(D)** validity of contracts and liabilities inuring to CJR or affecting the Assets, whether contingent or otherwise.

B.      The purchase price for the Assets ("Purchase Price") shall be their fair market value, (or, for leased assets, the fair market value of Franchisee's lease) determined as of the effective date of purchase in a manner that accounts for reasonable depreciation and condition of the Assets; provided, however, that the Purchase Price shall take into account the termination of this Agreement. Further, the Purchase Price for the Assets shall not contain any factor or increment for any trademark, service mark or other commercial symbol used in connection with the operation of the Franchised Restaurant nor any goodwill or "going concern" value for the Franchised Restaurant. CJR may exclude from the Assets purchased in accordance with this Section any equipment, vehicles, furnishings, fixtures, signs, and inventory that are not approved as meeting then-current standards for a Carl's Jr. Restaurant or for which Franchisee cannot deliver a Bill of Sale in a form satisfactory to CJR.

C.      If CJR and Franchisee are unable to agree on the fair market value of the Assets within 30 days after Franchisee's receipt of CJR's notice of its intent to exercise its option to purchase the Assets, the fair market value shall be determined by two professionally certified appraisers, Franchisee selecting one and CJR selecting one. If the higher appraisal is more than 10% greater than the other appraisal, the two appraisers shall select a third professionally certified appraiser who also shall appraise the fair market value of the Assets. The average value set by the appraisers (whether two or three appraisers as the case may be) shall be conclusive and shall be the Purchase Price.

D.      The appraisers shall be given full access to the Franchised Restaurant, the Franchised Location and Franchisee's books and records during customary business hours to conduct the appraisal and shall value the leasehold improvements, equipment, furnishings, fixtures, signs and inventory in accordance

with the standards of this Section 20.  The appraisers' fees and costs shall be borne equally by CJR and Franchisee.

      **E.**    Within 10 days after the Purchase Price has been determined, CJR may exercise its option to purchase the Assets by so notifying Franchisee in writing ("CJR's Purchase Notice").  The Purchase Price shall be paid in cash or cash equivalents at the closing of the purchase ("Closing"), which shall take place no later than 60 days after the date of CJR's Purchase Notice.  From the date of CJR's Purchase Notice until Closing:

      **(1)**    Franchisee shall operate the Franchised Restaurant and maintain the Assets in the usual and ordinary course of business and maintain in full force all insurance policies required under this Agreement; and

      **(2)**    CJR shall have the right to appoint a manager, at CJR's expense, to control the day-to-day operations of the Franchised Restaurant, and Franchisee shall cooperate, and instruct its employees to cooperate, with the manager appointed by CJR.  Alternatively, CJR may require Franchisee to close the Franchised Restaurant during such time period without removing any Assets from the Franchised Restaurant.

      **F.**    For a period of 30 days after the date of CJR's Purchase Notice ("Due Diligence Period"), CJR shall have the right to conduct such investigations as it deems necessary and appropriate to determine: (1) the ownership, condition and title of the Assets; (2) liens and encumbrances on the Assets; (3) environmental and hazardous substances at or upon the Franchised Location; and (4) the validity of contracts and liabilities inuring to CJR or affecting the Assets, whether contingent or otherwise.  Franchisee will afford CJR and its representatives access to the Franchised Restaurant and the Franchised Location at all reasonable times for the purpose of conducting inspections of the Assets; provided that such access does not unreasonably interfere with Franchisee's operations of the Franchised Restaurant.

      **G.**    During the Due Diligence Period, at its sole option and expense, CJR may (1) cause the title to the Assets that consist of real estate interests ("Real Estate Assets") to be examined by a nationally recognized title company and conduct lien searches as to the other Assets; (2) procure "AS BUILT" surveys of the Real Estate Assets; (3) procure environmental assessments and testing with respect to the Real Estate Assets; and/or (4) inspect the Assets that consist of leasehold improvements, equipment, vehicles, furnishings, fixtures, signs and inventory ("Fixed Assets") to determine if the Fixed Assets are in satisfactory working condition.  Prior to the end of the Due Diligence Period, CJR shall notify Franchisee in writing of any objections that CJR has to any finding disclosed in any title to lien search, survey, environmental assessment or inspection.  If Franchisee cannot or elects not to correct any such title defect, environmental objection or defect in the working condition of the Fixed Assets, CJR will have the option to either accept the condition of the Assets as they exist or rescind its option to purchase on or before the Closing.

      **H.**    Prior to the Closing, Franchisee and CJR shall comply with all applicable legal requirements, including the bulk sales provisions of any applicable laws and regulations.  Franchisee shall, prior to or simultaneously with the Closing, pay all tax liabilities incurred in connection with the operation of the Franchised Restaurant prior to Closing.  CJR shall have the right to set off against and reduce the Purchase Price by any and all amounts owed by Franchisee to CJR, and the amount of any encumbrances or liens against the Assets or any obligations assumed by CJR.

      **I.**    If the Franchised Location is leased, CJR agrees to use reasonable efforts to effect a termination of the existing lease for the Franchised Location.  If the lease for the Franchised Location is assigned to CJR or CJR subleases the Franchised Location from Franchisee, CJR will indemnify and hold Franchisee harmless from any ongoing liability under the lease from the date CJR assumes possession of the Franchised Location, and Franchisee will indemnify and hold CJR harmless from any liability under the lease prior to and including that date.

**J.**     If Franchisee owns the Franchised Location, CJR, at its option, will either purchase the fee simple interest or, upon purchase of the other Assets, enter into a standard lease with Franchisee on terms comparable to those for which similar commercial properties in the area are then being leased. The initial term of this lease with Franchisee shall be at least 10 years with 4 options to renew of 5 years each and the rent shall be the fair market rental value of the Franchised Location. If Franchisee and CJR cannot agree on the fair market rental value of the Franchised Location, then appraisers (selected in the manner described in Section 20.C.) shall determine the rental value.

**K.**     At the Closing, Franchisee shall deliver instruments transferring to CJR or its assignee: (1) good and merchantable title to the Assets purchased, free and clear of all liens and encumbrances (other than liens and security interests acceptable to CJR or its assignee), with all sales and other transfer taxes paid by the Franchisee; (2) all licenses and permits for the Franchised Restaurant that may be assigned or transferred, with appropriate consents, if required; and (3) the lease or sublease for the Franchised Location, with appropriate consents, if required. If Franchisee cannot deliver clear title to all of the purchased Assets as indicated in this Section, or if there are other unresolved issues, the Closing shall be accomplished through an escrow.

## 21.     RELATIONSHIP OF THE PARTIES

This Agreement does not create a fiduciary or other special relationship between the parties. No agency, employment, or partnership is created or implied by the terms of this Agreement, and Franchisee is not and shall not hold itself out as agent, legal representative, partner, subsidiary, joint venturer or employee of CJR or its affiliates. Franchisee shall have no right or power to, and shall not, bind or obligate CJR or its affiliates in any way or manner, nor represent that Franchisee has any right to do so. Franchisee shall not issue any press releases without the prior written consent of CJR.

Franchisee is an independent contractor and is solely responsible for all aspects of the development and operation of the Franchised Restaurant, subject only to the conditions and covenants established by this Agreement. Without limiting the generality of the foregoing, Franchisee acknowledges that CJR has no responsibility to ensure that the Franchised Restaurant is developed and operated in compliance with all applicable laws, ordinances and regulations and that CJR shall have no liability in the event the development or operation of the Franchised Restaurant violates any law, ordinance or regulation.

The sole relationship between Franchisee and CJR is a commercial, arms' length business relationship and, except as provided in Section 22, there are no third party beneficiaries to this Agreement. Franchisee's business is, and shall be kept, totally separate and apart from any that may be operated by CJR. In all public records, in relationships with other persons, and on letterheads and business forms, Franchisee shall indicate its independent ownership of the Franchised Restaurant and that Franchisee is solely a franchisee of CJR. Franchisee shall post a sign in a conspicuous location in the Franchised Restaurant which will contain Franchisee's name and state that the Franchised Restaurant is independently owned and operated by Franchisee under a franchise agreement with CJR.

## 22.     INDEMNIFICATION

**A.**     Franchisee and all guarantors of Franchisee's obligations under this Agreement shall, at all times, indemnify, defend (with counsel reasonably acceptable to CJR), and hold harmless (to the fullest extent permitted by law) CJR and its parents and affiliates, and their respective predecessors, successors, assigns, past and present stockholders, directors, officers, employees, agents and representatives (collectively "Indemnitees") from and against all "losses and expenses" (as defined below) incurred in connection with any action, suit, proceeding, claim, demand, investigation, inquiry (formal or informal), judgment or appeal thereof by or against CJR and/or Indemnitees or any settlement thereof (whether or not a formal proceeding or action had been instituted), arising out of, in connection with or in relation to this Agreement, any related agreement, the operation of the Franchised Restaurant, Franchisee's activities under this Agreement, or Franchisee's compliance with applicable laws. Franchisee promptly shall give CJR written notice of any

such action, suit, proceeding, claim, demand, inquiry or investigation filed or instituted against Franchisee and, upon request, shall furnish CJR with copies of any documents from such matters as CJR may request.

At Franchisee's expense and risk, CJR may elect to assume (but under no circumstances will CJR be obligated to undertake), the defense and/or settlement of any action, suit, proceeding, claim, demand, investigation, inquiry, judgment or appeal thereof subject to this indemnification. Such an undertaking shall, in no manner or form, diminish Franchisee's obligation to indemnify and hold harmless CJR and Indemnitees. CJR shall not be obligated to seek recoveries from third parties or otherwise mitigate losses.

    **B.** As used in this Section, the phrase "losses and expenses" shall include, but not be limited to, all losses; compensatory, exemplary and punitive damages; fines; charges; costs; expenses; lost profits; reasonable attorneys' fees; expert witness fees; court costs; settlement amounts; judgments; compensation for damages to CJR's reputation and goodwill; costs of or resulting from delays; financing; costs of advertising material and media time/space and the costs of changing, substituting or replacing the same; and any and all expenses of recall, refunds, compensation, public notices and other such amounts incurred in connection with the matters described.

## 23. CONSENTS, APPROVALS AND WAIVERS

    **A.** Whenever this Agreement requires the prior approval, acceptance or consent of CJR, Franchisee shall make a timely written request to CJR therefor; and any approval, acceptance or consent received, in order to be effective and binding upon CJR, must be obtained in writing and be signed by an authorized officer of CJR.

    **B.** CJR makes no warranties or guarantees upon which Franchisee may rely by providing any waiver, approval, acceptance, consent or suggestion to Franchisee in connection with this Agreement, and assumes no liability or obligation to Franchisee therefor, or by reason of any neglect, delay, or denial of any request therefor. CJR shall not, by virtue of any approvals, consents, acceptances, advice or services provided to Franchisee, assume responsibility or liability to Franchisee or to any third parties to which CJR would not otherwise be subject.

    **C.** No failure of CJR to exercise any power reserved to it by this Agreement or to insist upon strict compliance by Franchisee with any obligation or condition hereunder, and no custom or practice of the parties at variance with the terms of this Agreement, shall constitute a waiver of CJR's right to demand exact compliance with any of the terms of this Agreement. A waiver by CJR of any particular default by Franchisee shall not affect or impair CJR's rights with respect to any subsequent default of the same, similar or different nature, nor shall any delay, forbearance or omission of CJR to exercise any power or right arising out of any breach or default by Franchisee of any of the terms, provisions or covenants of this Agreement affect or impair CJR's right to exercise the same, nor shall such constitute a waiver by CJR of any right hereunder, or the right to declare any subsequent breach or default and to terminate this Agreement prior to the expiration of its term. Subsequent acceptance by CJR of any payments due to it hereunder shall not be deemed to be a waiver by CJR of any preceding breach by Franchisee of any terms, covenants or conditions of this Agreement.

## 24. NOTICES

    No notice, demand, request or other communication to the parties shall be binding upon the parties unless the notice is in writing, refers specifically to this Agreement and: (A) if to Franchisee, is addressed to Franchisee at the notice address set forth in Appendix A; and (B) if to CJR, is addressed to Carl's Jr. Restaurants LLC, 6307 Carpinteria Avenue, Suite A, Carpinteria, California 93013-2901 (Attn: Franchise Department) (Facsimile: 001-714-780-6565) with a copy to Carl's Jr. Restaurants LLC, 6307 Carpinteria Avenue, Suite A, Carpinteria, California 93013-2901 (Attn: Executive Vice President of International) (Facsimile: 001-714-780-6834) (e-mail: nlyerly@ckr.com). Any party may designate a new address for notices by giving notice of the new address pursuant to this Section. Notices shall be effective upon receipt or first refusal of delivery and may be: (1) delivered personally; (2) transmitted by facsimile or electronic

mail to the number(s) set forth above (or in Appendix A) with electronic confirmation of receipt; (3) mailed postage prepaid, certified mail, return receipt requested; or (4) mailed via overnight courier.

## 25.   ENTIRE AGREEMENT

CJR and Franchisee acknowledge that each element of this Agreement is essential and material and that, except as otherwise provided in this Agreement, the parties shall deal with each other in good faith. This Agreement, the OPM, the documents referred to herein, and the attachments hereto, constitute the entire, full and complete agreement between the parties concerning Franchisee's rights, and supersede any and all prior or contemporaneous negotiations, discussions, understandings or agreements. There are no other representations, inducements, promises, agreements, arrangements, or undertakings, oral or written, between the parties relating to the matters covered by this Agreement other than those set forth in this Agreement and in the attachments. No obligations or duties that contradict or are inconsistent with the express terms of this Agreement may be implied into this Agreement. Except as expressly set forth herein, no amendment, change or variance from this Agreement shall be binding on either party unless mutually agreed to by the parties and executed in writing.

## 26.   SEVERABILITY AND CONSTRUCTION

A.      Each article, paragraph, subparagraph, term and condition of this Agreement, and any portions thereof, will be considered severable. If, for any reason, any portion of this Agreement is determined to be invalid, contrary to, or in conflict with, any applicable present or future law, rule or regulation in a final, unappealable ruling issued by any court, agency or tribunal with valid jurisdiction in a proceeding to which CJR is a party, that ruling will not impair the operation of, or have any other effect upon, any other portions of this Agreement; all of which will remain binding on the parties and continue to be given full force and effect.

B.      Except as otherwise provided in Section 22, nothing in this Agreement is intended, nor shall be deemed, to confer upon any person or legal entity other than Franchisee and CJR and its affiliates and such of their heirs, successors and assigns, any rights or remedies under or by reason of this Agreement. Franchisee agrees that no past, present or future director, officer, employee, incorporator, member, partner, stockholder, subsidiary, affiliate, controlling party, entity under common control, ownership or management, vendor, service provider, agent, attorney or representative of CJR will have any liability for: (1) any obligations or liabilities of CJR relating to or arising from this Agreement; (2) any claim against CJR based on, in respect of, or by reason of the relationship between Franchisee and CJR; or (3) any claim against CJR based on any alleged unlawful act or omission of CJR.

C.      Franchisee expressly agrees to be bound by any promise or covenant imposing the maximum duty permitted by law that is subsumed within the terms of any provision of this Agreement, as though it were separately articulated in and made a part of this Agreement, that may result from striking from any of the provisions of this Agreement any portion or portions which a court may hold to be unreasonable and unenforceable in a final decision to which CJR is a party, or from reducing the scope of any promise or covenant to the extent required to comply with such a court order.

D.      No provision of this Agreement shall be interpreted in favor of, or against, the party that drafted this Agreement.

E.      As used in this Agreement, the term "affiliate" means any entity that is under common control with the concerned party or has the same owner or parent as the concerned party.

F.      Whenever CJR has expressly reserved in this Agreement a right and/or discretion to take or withhold an action, or to grant or decline to grant Franchisee a right to take or withhold an action, except as otherwise expressly and specifically provided in this Agreement, CJR may make such decision or exercise its right and/or discretion on the basis of its judgment of what is in its best interests. This also applies if CJR is deemed to have a right and/or discretion. CJR's judgment of what is in the best interests of the System, at

the time its decision is made or its right or discretion is exercised, can be made without regard to whether: (1) other reasonable alternative decisions or actions, or even arguably preferable alternative decisions or actions, could have been made by CJR; (2) CJR's decision or the action taken promotes its financial or other individual interest; (3) CJR's decision or the action taken applies differently to Franchisee and one or more other Franchisees or franchisees or CJR company-operated or affiliate-operated operations; or (4) CJR's decision or the action taken is adverse to Franchisee's interests. CJR will have no liability to Franchisee for any such decision or action. CJR and Franchisee intend that the exercise of CJR's right or discretion will not be subject to limitation or review. If applicable law implies a covenant of good faith and fair dealing in this Agreement, CJR and Franchisee agree that such covenant will not imply any rights or obligations that are inconsistent with a fair construction of the terms of this Agreement and that this Agreement grants CJR the right to make decisions, take actions and/or refrain from taking actions not inconsistent with Franchisee's rights and obligations under this Agreement.

## 27.   GOVERNING LAW, FORUM AND LIMITATIONS

**A.**     This Agreement and any claim or controversy arising out of, or relating to, rights and obligations of the parties under this Agreement and any other claim or controversy between the parties shall be governed by and construed in accordance with the laws of the State of California without regard to conflicts of laws principles; provided, however, that the provisions of Section 17 shall be interpreted and construed under the laws of the jurisdiction in which the Franchised Restaurant is located. Nothing in this Section is intended, or shall be deemed, to make any California law regulating the offer or sale of franchises or the franchise relationship applicable to this Agreement if such law would not otherwise be applicable. If the Franchised Restaurant is located in Alberta, Prince Edward Island, Ontario, New Brunswick or Manitoba, or if Franchisee is domiciled in Alberta, the law of the applicable province shall be the governing law in lieu of the law of the State of California.

**B.**     The parties agree that, to the extent any disputes cannot be resolved directly between them, Franchisee shall file any suit against CJR only in the federal or state court having jurisdiction where CJR's principal offices are located at the time suit is filed. CJR may file suit in the federal or state court located in the jurisdiction where its principal offices are located at the time suit is filed or in the federal or provincial court located in the jurisdiction where Franchisee resides or does business or where the Franchised Restaurant is or was located or where the claim arose. Franchisee consents to the personal jurisdiction of those courts over Franchisee and to venue in those courts. If the Franchised Restaurant is located in Alberta, Prince Edward Island, Ontario, New Brunswick or Manitoba, or if Franchisee is domiciled in Alberta, nothing in this Section shall prohibit Franchisee from filing suit in the applicable province.

**C.**     Except for payments owed by one party to the other, and unless prohibited by applicable law, any legal action or proceeding (including the offer and sale of a franchise to Franchisee) brought or instituted with respect to any dispute arising from or related to this Agreement or with respect to any breach of the terms of this Agreement must be brought or instituted within a period of 2 years after the initial occurrence of any act or omission that is the basis of the legal action or proceeding, whenever discovered.

**D.**     Franchisee and CJR waive, to the fullest extent permitted by law, any right or claim of any consequential, punitive or exemplary damages against each other and agree that, in the event of a dispute between them, each shall be limited to the recovery of actual damages sustained by it. Franchisee and CJR waive, to the fullest extent permitted by law, the right to bring, or be a class member in, any class action suits and the right to trial by jury.

**E.**     If either party brings an action to enforce this Agreement in a judicial proceeding, the party prevailing in that proceeding shall be entitled to reimbursement of costs and expenses, including, but not limited to, reasonable accountants', attorneys', attorneys' assistants' and expert witness fees, the cost of investigation and proof of facts, court costs, other litigation expenses, and travel and living expenses, whether incurred prior to, in preparation for, in contemplation of, or subsequent to, the filing of, the proceeding. If CJR utilizes legal counsel (including in-house counsel employed by CJR) in connection with any failure by Franchisee to comply with this Agreement, Franchisee shall reimburse CJR for any of the

above-listed costs and expenses incurred by CJR. In any judicial proceeding, the amount of these costs and expenses will be determined by the court and not by a jury.

     **F.**     No right or remedy conferred upon or reserved to CJR or Franchisee by this Agreement is intended to be, nor shall be deemed, exclusive of any other right or remedy herein or by law or equity provided or permitted, but each shall be cumulative of every other right or remedy. The provisions of this Section 27 shall survive the expiration or earlier termination of this Agreement.

## 28.    MISCELLANEOUS

### A.    Gender and Number

     All references to gender and number shall be construed to include such other gender and number as the context may require.

### B.    Captions

     All captions in this Agreement are intended solely for the convenience of the parties, and none shall be deemed to affect the meaning or construction of any provision of this Agreement.

### C.    Counterparts and Signatures

     This Agreement may be executed in counterparts, and each counterpart so executed and delivered shall be deemed an original. This Agreement, any exhibit hereto and any related agreement may be signed using electronic signatures and records, and such signature(s) shall have full legal force and effect.

### D.    Time

     Time is of the essence of this Agreement for each provision in which time is a factor. Whenever this Agreement refers to a period of days or months, the first day or month to be counted shall be the day or month of the designated action, event or notice. Except where otherwise noted, days shall be measured by calendar days, provided that if the last day of a period is a Saturday, Sunday or national or provincial holiday, the period automatically shall be extended to the next day that is not a Saturday, Sunday or national or provincial holiday.

### E.    Injunctive Relief

     Franchisee recognizes that its failure to comply with the terms of this Agreement, including, but not limited to, the failure to fully comply with all post-termination obligations, is likely to cause irreparable harm to CJR, its affiliates and the Carl's Jr. System. Therefore, Franchisee agrees that, in the event of a breach or threatened breach of any of the terms of this Agreement by Franchisee, CJR shall be entitled to injunctive relief (both preliminary and permanent) restraining that breach and/or to specific performance without showing or proving actual damages and without posting any security for costs. Any equitable remedies sought by CJR shall be in addition to, and not in lieu of, all remedies and rights that CJR otherwise may have arising under applicable law or by virtue of any breach of this Agreement.

### F.    Control During Crisis Situation

     If an event occurs at the Franchised Restaurant that has or reasonably may cause harm or injury to customers, guests or employees (*i.e.*, food spoilage/poisoning, food tampering/sabotage, slip and fall injuries, natural disasters, robberies, shootings, etc.) or may damage the Proprietary Marks, the Carl's Jr. System or the reputation of CJR ("Crisis Situation"), Franchisee shall: **(1)** immediately contact appropriate emergency care providers to assist it in curing the harm or injury; and **(2)** immediately inform CJR by telephone of the Crisis Situation. Franchisee shall refrain from making any internal or external announcements (*i.e.*, no

communication with the news media) regarding the Crisis Situation (unless otherwise directed by CJR or public health officials).

To the extent CJR deems appropriate, in its sole and absolute discretion, CJR or its designee may control the manner in which the Crisis Situation is handled by the parties, including, without limitation, conducting all communication with the news media, providing care for injured persons and/or temporarily closing the Franchised Restaurant. The parties acknowledge that, in directing the management of any Crisis Situation, CJR or its designee may engage the services of attorneys, experts, doctors, testing laboratories, public relations firms and those other professionals as it deems appropriate. Franchisee and its employees shall cooperate fully with CJR or its designee in its efforts and activities in this regard and shall be bound by all further Crisis Situation procedures developed by CJR from time to time hereafter. The indemnification under Section 22 shall include all losses and expenses that may result from the exercise by CJR or its designee of the management rights granted in this Section 28.F.

G.      Privacy

If requested by CJR, Franchisee must sign and/or obtain from any guarantor, owner, officer, director, shareholder, employer, customer, or any other person designated by CJR, written consent to collection, use, and disclosure of personal information by Franchisee and/or CJR for certain legitimate business purposes specified by CJR in such consent.

29.     REPRESENTATIONS

Franchisee represents, acknowledges and warrants to CJR (and Franchisee agrees that these representations, acknowledgments and warranties shall survive termination of this Agreement) that:

A.      This Agreement involves significant legal and business rights and risks. CJR does not guarantee Franchisee's success. Franchisee has read this Agreement in its entirety, conducted an independent investigation of the business contemplated by this Agreement, has been thoroughly advised with regard to the terms and conditions of this Agreement by legal counsel or other advisors of Franchisee's choosing, recognizes that the nature of the business conducted by Carl's Jr. Restaurants may change over time, has had ample opportunity to investigate all representations made by or on behalf of CJR, and has had ample opportunity to consult with current and former franchisees of CJR. The prospect for success of the business undertaken by Franchisee is speculative and depends to a material extent upon Franchisee's personal commitment, capability and direct involvement in the day-to-day management of the business.

B.      CJR makes no express or implied warranties or representations that Franchisee will achieve any degree of success in the development or operation of the Franchised Restaurant and that success in the development and operation of the Franchised Restaurant depends ultimately on Franchisee's efforts and abilities and on other factors, including, but not limited to, market and other economic conditions, Franchisee's financial condition and competition.

C.      CJR has entered, and will continue to enter, into agreements with other franchisees. The manner in which CJR enforces its rights and the franchisees' obligations under any of those other agreements shall not affect the ability of CJR to enforce its rights or Franchisee's obligations under this Agreement.

D.      The Initial Franchise Fee is not refundable for any reason.

E.      CJR may change or modify the Carl's Jr. System, from time to time, including the OPM, and Franchisee will be required to make such expenditures as such changes or modifications in the Carl's Jr. System may require.

F.      Nothing in this Agreement prohibits CJR or its affiliates from:  (1) operating or licensing others to operate Carl's Jr. Restaurants at any location other than the Franchised Location; (2) operating or licensing others to operate restaurants, other than Carl's Jr. Restaurants, at any location; (3) utilizing the Carl's Jr. System or any part of the Carl's Jr. System in any manner other than operation by CJR or its affiliates of a Carl's Jr. Restaurant at the Franchised Location; and (4) merchandising and distributing goods and services identified by the Proprietary Marks at any location through any other method or channel of distribution.

G.      All information Franchisee provided to CJR in connection with Franchisee's franchise application and CJR's grant of this Franchise is truthful, complete and accurate.

H.      The persons signing this Agreement on behalf of Franchisee have full authority to enter into this Agreement and the other agreements contemplated by the parties.  Execution of this Agreement or such other agreements by Franchisee does not and will not conflict with or interfere with, directly or indirectly, intentionally or otherwise, with the terms of any other agreement with any other third party to which Franchisee or any person with an ownership interest in Franchisee is a party.

I.      Franchisee acknowledges receipt of CJR's Disclosure Document at least 14 days prior to execution of this Agreement or payment of any monies to CJR.

J.      Franchisee has not received from CJR or its affiliates or anyone acting on their behalf, any representation of Franchisee's potential sales, expenses, income, profit or loss.

K.      Franchisee has not received from CJR or its affiliates or anyone acting on their behalf, any representations other than those contained in CJR's Disclosure Document as inducements to enter this Agreement.

L.      Even though this Agreement contains provisions requiring Franchisee to operate the Franchised Restaurant in compliance with the Carl's Jr. System:  (1) CJR and its affiliates do not have actual or apparent authority to control the day-to-day conduct and operation of Franchisee's business or employment decisions; and (2) Franchisee and CJR do not intend for CJR or its affiliates to incur any liability in connection with or arising from any aspect of the Carl's Jr. System or Franchisee's use of the Carl's Jr. System, whether or not in accordance with the requirements of the OPM.

M.      In the event of a dispute between CJR and Franchisee, the parties have waived their right to a jury trial.

30.     ETHICAL STANDARDS

A.      High Ethical Standards

CJR is committed to maintaining high standards of ethical conduct and legal compliance and Franchisee also agrees to maintain these high standards.  In that regard, Franchisee represents that: (1) neither Franchisee nor any affiliate is a public official; (2) neither Franchisee nor any affiliate has made or attempted to make (or caused, encouraged or authorized any person to make or attempt to make) any payment to a public official in order to influence any act, omission or determination for the purpose of obtaining or retaining business, directing business to any person or securing any improper advantage of any kind; (3) Franchisee maintains its books and records in a manner calculated to prevent, and to permit CJR and Franchisee to detect, the type of conduct described in Section 30.A.(2) and the existence of any irregular or "slush" accounts or the occurrence of off-books transactions related to this Agreement; (4) Franchisee is in compliance with all legal prohibitions on money laundering; and (5) neither Franchisee, any affiliate nor any employee of Franchisee is, and Franchisee does not associate or do business related to this Agreement with: (a) any person with whom it is unlawful for CJR to associate, deal or do business; or (b) any person whose

name appears on any current denied person list, specially designated nationals and blocked entities list or any similar list issued by a United States or Canadian government agency.

**B.    Applicable United States Laws**

Franchisee understands that CJR is subject to United States federal, state and local laws (including the Foreign Corrupt Practices Act, the USA PATRIOT ACT, the Export Administration Act and Regulations and the International Traffic in Arms Regulations) which, if violated, may not only damage the good name and reputation of CJR, the Carl's Jr. System and the Proprietary Marks, but also may cause severe tax consequences and harsh civil and criminal penalties for CJR. Accordingly, under no circumstances will CJR be obligated to take any action or omit to take any action which CJR believes in good faith would cause CJR to be in violation of any applicable Canadian federal, provincial or local laws or United States federal, state or local laws.

Franchisee acknowledges that under applicable United States law, including, without limitation, Executive Order 13224, signed on September 23, 2001 ("Order"), CJR is prohibited from engaging in any transaction with any person engaged in, or with a person aiding any person engaged in, acts of terrorism, as defined in the Order. Accordingly, Franchisee represents and warrants to CJR that, as of the date of this Agreement, neither Franchisee nor any person holding any ownership interest in Franchisee, controlled by Franchisee, or under common control with Franchisee is designated under the Order as a person with whom business may not be transacted by CJR, and that Franchisee: **(1)** does not, and hereafter shall not, engage in any terrorist activity; **(2)** is not affiliated with and does not support any individual or entity engaged in, contemplating, or supporting terrorist activity; and **(3)** is not acquiring the rights granted under this Agreement with the intent to generate funds to channel to any individual or entity engaged in, contemplating, or supporting terrorist activity, or to otherwise support or further any terrorist activity.

**C.    Cooperation with Compliance Audit**

Franchisee represents that it will cooperate fully and to the complete satisfaction of CJR with: **(1)** any compliance audit conducted by or on behalf of CJR in connection with matters covered by this Section; **(2)** any order to cease operations issued in connection with matters covered by this Section; and **(3)** any compliance audit, investigation or other proceeding in connection with matters covered by this Section that is conducted by or on behalf of any authority having jurisdiction over CJR or any of its affiliates or over Franchisee or any of its affiliates.

**IN WITNESS WHEREOF**, the parties have duly executed, sealed and delivered this Agreement as of the day and year first above written.

ATTEST:

By: _Wendy Wilson_

Print Name: _Wendy Wilson_

Title: _Contract Coordinator_

ATTEST:

Print Name: _____

Title: _Notary Public_

CJR:
**CARL'S JR. RESTAURANTS LLC**

By: _____

Print Name: Romondous Stover

Title: Vice President, Legal

Date: November 12, 2014

**FRANCHISEE:**
**6POINTS FOOD SERVICES LTD.**

By: _____

Print Name: Michael Levine

Title: President

Date: October 27, 2014

## APPENDIX A
## FRANCHISE INFORMATION

1.   **Franchised Location (Recitals):**

     Waterloo
     75 King St.
     Cross Street: Willis Way
     Waterloo, Ontario, Canada

2.   **Initial Franchise Fee (Section 3.A):**  U.S. $35,000

3.   **Franchisee's APO (Section 3.C and Section 5):**  Franchisee's Advertising Fees under Sections 3.C
     and 5 of the Franchise Agreement shall be as set forth below, unless and until modified by CJR as
     provided in Section 5.A:

| TOTAL ADVERTISING FEES: Up to 7% of Gross Sales | | |
|---|---|---|
| 1. | Production Fund (Section 5.B) | U.S. $150 |
| 2. | Marketing Fund (Section 5.C) | 3 % of Gross Sales |
| 3. | LSM allocation (Section 5.E) | The balance of the Advertising Fee |

4.   **Interests in Other Restaurants (Section 17.C.(2)(c)):** _____

5.   **Franchisee's Notice Address (Section 24):**

     6Points Food Services Ltd.
     Unit A-28, 134 Primrose Drive
     Saskatoon, Saskatchewan, Canada S7K 5S6

**APPENDIX C**
**LIST OR PROPRIETARY MARKS**

| Mark | Number | Date Filed/Date Issued | Class(es) | Pending/Registered |
|------|--------|------------------------|-----------|--------------------|
| CARL'S JR. | TMA 723,999 | 09/18/08 | 16, 43 | Registered |
|  | TMA 724,355 | 09/24/08 | 29, 30, 43 | Registered |
|  | TMA 762,456 | 03/24/10 | 43 | Registered |
|  | TMA 762,402 | 03/24/10 | 43 | Registered |
| FAMOUS STAR | TMA 764,631 | 04/21/10 | 30 | Registered |
| EAT LIKE YOU MEAN IT | TMA 870,913 | 02/01/14 | 43 | Registered |
| THE ORIGINAL SIX DOLLAR BURGER | 1351386 | 06/12/07 | 30, 43 | Pending |
| WESTERN BACON CHEESEBURGER | 1605004 | 12/04/12 | 30 | Pending |
| SUPER STAR REWARDS | 1650338 | 11/01/13 | 9, 35 | Pending |

## APPENDIX B

## OWNERSHIP INTERESTS

1.  The following persons constitute all of the owners of a legal and/or beneficial interest in Franchisee as of the date of the Franchise Agreement:

| Name | Address | Ownership Interest | Office Held/Position |
|---|---|---|---|
| Westbridge | Unit A2B - 134 Primrose Drive | 100% | |
| | | | |
| | | | |

2.  Franchisee's Continuity Group is comprised of the following persons: _Mike LeVine, Mike Teebins, Kent Graber_

3.  Franchisee's Operating Principal is: _Kent Graber_

**FRANCHISEE:**
**6POINTS FOOD SERVICES LTD.**

By: _____

Name: _President_

Title: _Mike LeVine._

Date: _10/29/14_